SELECTIVE SERVICE SYSTEM ET AL. *v.* MINNESOTA
PUBLIC INTEREST RESEARCH GROUP ET AL.

No. 83–276.   Argued April 23, 1984—Decided July 5, 1984

842

BURGER, C. J., delivered the opinion of the Court, in which WHITE, REHNQUIST, STEVENS, and O'CONNOR, JJ., joined, and in Parts I, II–B, III, and IV of which POWELL, J., joined. POWELL, J., filed an opinion concurring in part and concurring in the judgment, *post*, p. 859. BREN-

NAN, J., *post*, p. 862, and MARSHALL, J., *post*, p. 862, filed dissenting opinions. BLACKMUN, J., took no part in the decision of the case.

*Solicitor General Lee* argued the cause for appellants. With him on the briefs were *Acting Assistant Attorney General Willard, Deputy Solicitor General Bator, John H. Garvey,* and *Neil H. Koslowe.*

*William J. Keppel* argued the cause for appellees. With him on the brief was *E. Gail Suchman.**

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We noted probable jurisdiction to decide (a) whether § 12(f) of the Military Selective Service Act, 96 Stat. 748, 50 U. S. C. App. § 462(f), which denies federal financial assistance under Title IV of the Higher Education Act of 1965 to male students who fail to register for the draft under the Act, is a bill of attainder; and (b) whether § 12(f) compels those students who elect to request federal aid to incriminate themselves in violation of the Fifth Amendment.

## I

Section 3 of the Military Selective Service Act, 62 Stat. 605, as amended, 50 U. S. C. App. § 453, empowers the President to require every male citizen and male resident alien between the ages of 18 and 26 to register for the draft. Sections 12(b) and (c) of that Act impose criminal penalties for failure to register. On July 2, 1980, President Carter issued a Proclamation requiring young men to register within 30 days of their 18th birthday. Presidential Proclamation No. 4771, 3 CFR 82 (1981).

---

**Peter B. Ellis* filed a brief for the Trustees of Boston University as *amici curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for Swarthmore College et al. by *Thomas P. Preston* and *Robert D. Williams;* and for the University of Minnesota et al. by *Stephen S. Dunham, William P. Donohue, Roderick K. Daane, Patricia Eames,* and *James D. Miller.*

Appellee students (hereafter appellees) are anonymous individuals who were required to register before September 1, 1982. On September 8, Congress enacted the Department of Defense Authorization Act of 1983, Pub. L. 97–252, 96 Stat. 718. Section 1113(a) of that Act added § 12(f) to the Military Selective Service Act. Section 12(f)(1) provides that any person who is required to register and fails to do so "in accordance with any proclamation" issued under the Military Selective Service Act "shall be ineligible for any form of assistance or benefit provided under title IV of the Higher Education Act of 1965."[1] Section 12(f)(2) requires applicants for Title IV assistance to file with their institutions of higher education a statement attesting to their compliance with the draft registration law and regulations issued under it. Sections 12(f)(3) and (4) require the Secretary of Education, in agreement with the Director of Selective Service, to prescribe methods for verifying such statements of compliance and to issue implementing regulations.

Regulations issued in final form on April 11, 1983, see 48 Fed. Reg. 15578, provide that no applicant may receive Title IV aid unless he files a statement of compliance certifying that he is registered with the Selective Service or that, for a specified reason, he is not required to register. 34 CFR § 668.24(a) (1983). The regulations allow a student who has not previously registered, although required to do so, to establish eligibility for Title IV aid by registering, filing a statement of registration compliance, and, if required, verifying that he is registered. § 668.27(b)(1). The statement of compliance does not require the applicant to state the date that he registered.[2]

---

[1] Title IV of the Higher Education Act of 1965, 20 U. S. C. § 1070 et seq., provides financial assistance to qualified students in postsecondary educational programs. Title IV aid is available at both colleges and universities, as well as at numerous kinds of business, trade, and technical schools. §§ 1085(b), (c), 1088.

[2] The regulations include a model statement of registration compliance that the Secretary of Education has indicated satisfies the requirements of 34 CFR § 668.24(a) (1983):

In November 1982 the Minnesota Public Interest Research Group filed a complaint in the United States District Court for the District of Minnesota seeking to enjoin the operation of § 12(f). The District Court dismissed the Minnesota Group for lack of standing but allowed three anonymous students to intervene as plaintiffs. 557 F. Supp. 923 (1983); 557 F. Supp. 925 (1983). The intervenors alleged that they reside in Minnesota, that they need financial aid to pursue their educations, that they intend to apply for Title IV assistance, and that they are legally required to register with the Selective Service but have failed to do so. This suit was informally consolidated with a separate action brought by three other anonymous students making essentially the same allegations as the intervenors.

In March 1983 the District Court granted a preliminary injunction restraining the Selective Service System from enforcing § 12(f). After finding that appellees had demonstrated a threat of irreparable injury, the court held that appellees were likely to succeed on the merits. First, the District Court thought it likely that § 12(f) was a bill of attain-

---

"STATEMENT OF EDUCATIONAL PURPOSE/
REGISTRATION COMPLIANCE

.                    .                    .                    .                    .

"____ I certify that I am not required to be registered with Selective Service, because: '

"____ I am female.

"____ I am in the armed services on active duty (Note: Members of the Reserves and National Guard are not considered on active duty.)

"____ I have not reached my 18th birthday.

"____ I was born before 1960.

"____ I am a permanent resident of the Trust Territory of the Pacific Islands or the Northern Mariana Islands.

"____ I certify that I am registered with Selective Service.

"Signature: _____

"Date: _____

"NOTICE: You will not receive title IV financial aid unless you complete this statement and, if required, give proof to your school of your registration compliance. . . ." 34 CFR § 668.25 (1983).

der. The court interpreted the statutory bar to student aid as applicable to students who registered late. Thus interpreted, the statute "clearly singles out an ascertainable group based on past conduct" and "legislatively determines the guilt of this ascertainable group." *Doe* v. *Selective Service System*, 557 F. Supp. 937, 942, 943 (1983). The court viewed the denial of aid as punishment within the meaning of the Bill of Attainder Clause because it "deprives students of the practical means to achieve the education necessary to pursue many vocations in our society." *Id.*, at 944. Second, the District Court found it likely that § 12(f) violated appellees' Fifth Amendment privilege against compelled self-incrimination. In the District Court's view, the statement of compliance required by § 12(f)(2) compels students who have not registered for the draft and need financial aid to confess to the fact of nonregistration, which is a crime. 50 U. S. C. App. § 462(a).

On June 16, 1983, the District Court entered a permanent, nationwide injunction against the enforcement of § 12(f). The court held that the regulations making late registrants eligible for aid were inconsistent with the statute and concluded that the statute was an unconstitutional attainder. It also held the statute to violate appellees' constitutional privilege against compelled self-incrimination.

On June 29, we stayed the District Court's June 16 order pending the timely docketing and final disposition of this appeal. *Selective Service System* v. *Doe*, 463 U. S. 1215. We noted probable jurisdiction on December 5, 1983, 464 U. S. 1006, and we reverse.

II

The District Court held that § 12(f) falls within the category of congressional actions that Art. I, § 9, cl. 3, of the Constitution bars by providing that "[n]o Bill of Attainder . . . shall be passed." A bill of attainder was most recently described by this Court as "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual

without provision of the protections of a judicial trial." *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 468 (1977); see *United States* v. *O'Brien*, 391 U. S. 367, 383, n. 30 (1968); *United States* v. *Lovett*, 328 U. S. 303, 315 (1946). Appellants argue that § 12(f) does not satisfy any of these three requirements, *i. e.*, specification of the affected persons, punishment, and lack of a judicial trial.[3]

A

In forbidding bills of attainder, the draftsmen of the Constitution sought to prohibit the ancient practice of the Parliament in England of punishing without trial "specifically designated persons or groups." *United States* v. *Brown*, 381 U. S. 437, 447 (1965). Historically, bills of attainder generally named the persons to be punished. However, "[t]he singling out of an individual for legislatively prescribed punishment constitutes an attainder whether the individual is called by name or described in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Communist Party of United States* v. *Subversive Activities Control Board*, 367 U. S. 1, 86 (1961). When past activity serves as "a point of reference for the ascertainment of particular persons ineluctably designated by the legislature" for punishment, *id.*, at 87, the Act may be an attainder. See *Cummings* v. *Missouri*, 4 Wall. 277, 324 (1867).

In *Cummings* the Court struck down a provision of the Missouri post-Civil War Reconstruction Constitution that

---

[3] We agree with appellants that the statute does not single out an identifiable group and that the denial of Title IV aid does not constitute punishment. Appellants also argue that § 12(f) does not dispense with a judicial trial, noting that a hearing is provided in the event of disagreement between the applicant and the Secretary about whether the applicant has registered, § 12(f)(4), and that the decision made at that hearing is subject to judicial review. Appellants' argument is meritless. Congress has not provided a judicial trial to those affected by the statute.

barred persons from various professions unless they stated under oath that they had not given aid or comfort to persons engaged in armed hostility to the United States and had never "'been a member of, or connected with, any order, society, or organization, inimical to the government of the United States.'" *Id.*, at 279. The Court recognized that the oath was required, not "as a means of ascertaining whether parties were qualified" for their professions, *id.*, at 320, but rather to effect a punishment for having associated with the Confederacy. Although the State Constitution did not mention the persons or groups required to take the oath by name, the Court concluded that in creating a qualification having no possible relation to their fitness for their chosen professions, the Constitution was intended "to reach the person, not the calling." *Ibid.*

On the same day that it decided *Cummings*, the Court struck down a similar oath that was required for admission to practice law in the federal courts. *Ex parte Garland*, 4 Wall. 333 (1867). Like the oath considered in *Cummings*, the oath "operate[d] as a legislative decree of perpetual exclusion" from the practice of law, *id.*, at 377, since past affiliation with the Confederacy prevented attorneys from taking the oath without perjuring themselves. See *Cummings* v. *Missouri, supra,* at 327. In both *Cummings* and *Garland*, the persons in the group disqualified were defined entirely by irreversible acts committed by them.

The District Court in this case viewed § 12(f) as comparable to the provisions of the Reconstruction laws declared unconstitutional in *Cummings* and *Garland*, because it thought the statute singled out nonregistrants and made them ineligible for aid based on their past conduct, *i. e.*, failure to register. To understand the District Court's analysis, it is necessary to turn to its construction of the statute. The court noted that § 12(f) disqualifies applicants for financial assistance unless they have registered "in accordance with any proclamation issued under [§ 3 of the Military Selective Service Act]," and

that Proclamation No. 4771 requires those born after January 1, 1963, to register within 30 days of their 18th birthday. See 3 CFR 82 (1981). In the court's view, the language of § 12(f), coupled with the Proclamation's 30-day registration requirement, precluded late registrants from qualifying for Title IV aid. Having construed § 12(f) as precluding late registration, the District Court read the statute to be retrospective, in that it denies financial assistance to an identifiable group—nonregistrants—based on their past conduct. The District Court acknowledged that implementing regulations would allow students who had not previously registered to become eligible for Title IV benefits by registering, see 34 CFR § 668.27(b)(1) (1983), but the court declared those regulations to be void because they conflicted with what the District Court viewed as § 12(f)'s requirement of registration within the time prescribed by Proclamation No. 4771.

We reject the District Court's view that § 12(f) requires registration within the time fixed by Proclamation No. 4771. That view is plainly inconsistent with the structure of § 12(f) and with the legislative history. Subsection (f)(4) of the statute requires the Secretary of Education to issue regulations providing that "any person" to whom the Secretary proposes to deny Title IV assistance shall be given notice of the proposed denial and "not less than thirty days" after such notice to "establis[h] that he has complied with the registration requirement." 50 U. S. C. App. § 462(f)(4). The statute clearly gives nonregistrants 30 days after receiving notice that they are ineligible for Title IV aid to register for the draft and qualify for aid. See 34 CFR § 668.27(b)(1) (1983). To require registration within the *time* fixed by the Presidential Proclamation would undermine this provision allowing "any person" 30 days *after notification* to establish compliance with the registration requirement. This was clearly a grace period.

The District Court also ignored the relevant legislative history. Congress' purpose in enacting § 12(f) was to encourage

registration by those who must register, but have not yet done so.[4] Proponents of the legislation emphasized that those failing to register timely can qualify for aid by registering late.[5] The District Court failed to take account of this legislative purpose. See *Heckler* v. *Edwards*, 465 U. S. 870 (1984). Nor did its construction of § 12(f) give adequate deference to the views of the Secretary of Education, who had helped to draft the statute. *Miller* v. *Youakim*, 440 U. S. 125, 144 (1979); see 128 Cong. Rec. 18363 (1982) (remarks of Rep. Solomon).

The judicial function is "not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations," *CSC* v. *Letter Carriers*, 413 U. S. 548, 571 (1973).[6] Section 12(f) does not make late registrants ineligible for Title IV aid.

Because it allows late registration, § 12(f) is clearly distinguishable from the provisions struck down in *Cummings* and *Garland*.[7] *Cummings* and *Garland* dealt with absolute bar-

---

[4] 128 Cong. Rec. 18356 (1982) (remarks of Rep. Whitehurst); *ibid.* (remarks of Rep. Solomon); *id.*, at 18369 (remarks of Rep. Stratton); *id.*, at 9664 (remarks of Sen. Hayakawa); *id.*, at 9666 (remarks of Sen. Jepsen).

[5] *Id.*, at 18356 (remarks of Rep. Whitehurst); *id.*, at 18357 (remarks of Rep. Simon); *id.*, at 18368 (remarks of Rep. Montgomery); *id.*, at 18369 (remarks of Rep. Stratton). As Senator Stennis stated:

"I thought of the proposition here where some youngster might have overlooked signing up or might have misunderstood it or had not been correctly informed, but he is not going to be penalized for that because he still has complete control of the situation. All he will have to do is just to comply with the law, and that will automatically make him eligible so far as this prohibition or restriction is concerned." *Id.*, at 9666.

[6] As the Solicitor General points out, one construction of the statute that avoids a constitutional problem is to make aid contingent on registration *in the manner*, but not the time, required by any proclamation. See Presidential Proclamation No. 4771, 3 CFR 84 (1981) ("Persons who are required to be registered shall comply with the registration procedures and other rules and regulations prescribed by the Director of Selective Service").

[7] All of the appellees in this case had failed to comply with the registration requirements when § 12(f) was enacted. As to 18-year-olds who have

riers to entry into certain professions for those who could not file the required loyalty oaths; no one who had served the Confederacy could possible comply, for his status was irreversible. By contrast, § 12(f)'s requirements, far from irreversible, can be met readily by either timely or late filing. "Far from attaching to . . . past and ineradicable actions," ineligibility for Title IV benefits "is made to turn upon continuingly contemporaneous fact" which a student who wants public assistance can correct. *Communist Party of United States* v. *Subversive Activities Control Board*, 367 U. S., at 87.

## B

Even if the specificity element were deemed satisfied by § 12(f), the statute would not necessarily implicate the Bill of Attainder Clause. The proscription against bills of attainder reaches only statutes that inflict punishment on the specified individual or group. In determining whether a statute inflicts punishment within the proscription against bills of attainder, our holdings recognize that the severity of a sanction is not determinative of its character as punishment. *Flemming* v. *Nestor*, 363 U. S. 603, 616, and n. 9 (1960). That burdens are placed on citizens by federal authority does not make those burdens punishment. *Nixon* v. *Administrator of General Services*, 433 U. S., at 470; *United States* v. *Lovett*, 328 U. S., at 324 (Frankfurter, J., concurring).[8] Conversely, legislative intent to encourage compliance with the law does not establish that a statute is merely the legitimate regulation of conduct. Punishment is not limited solely

---

entered the class of nonregistrants after August 9, 1982—30 days before the enactment of § 12(f)—the statute is clearly prospective; ineligibility for financial aid is merely a deprivation in addition to potential criminal liability for the failure to register for the draft.

[8] "The fact that harm is inflicted by governmental authority does not make it punishment. Figuratively speaking all discomforting action may be deemed punishment because it deprives of what otherwise would be enjoyed. But there may be reasons other than punitive for such deprivation." 328 U. S., at 324.

to retribution for past events, but may involve deprivations inflicted to deter future misconduct. *United States* v. *Brown,* 381 U. S., at 458–459. It is thus apparent that, though the governing criteria for an attainder may be readily indicated, "each case has turned on its own highly particularized context." *Flemming* v. *Nestor, supra,* at 616.

In deciding whether a statute inflicts forbidden punishment, we have recognized three necessary inquiries: (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, "viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes"; and (3) whether the legislative record "evinces a congressional intent to punish." *Nixon, supra,* at 473, 475–476, 478. We conclude that under these criteria § 12(f) is not a punitive bill of attainder.

### 1

At common law, bills of attainder often imposed the death penalty; lesser punishments were imposed by bills of pains and penalties. The Constitution proscribes these lesser penalties as well as those imposing death. *Cummings* v. *Missouri,* 4 Wall., at 323. Historically used in England in times of rebellion or "violent political excitements," *ibid.,* bills of pains and penalties commonly imposed imprisonment, banishment, and the punitive confiscation of property. *Nixon, supra,* at 474. In our own country, the list of punishments forbidden by the Bill of Attainder Clause has expanded to include legislative bars to participation by individuals or groups in specific employments or professions.[9]

---

[9] See, *e. g., United States* v. *Brown,* 381 U. S. 437 (1965), in which Communist Party members were barred from offices in labor unions; *United States* v. *Lovett,* 328 U. S. 303 (1946), in which the law in question cut off salaries to three named Government employees; *Cummings* v. *Missouri,* 4 Wall. 277 (1867), in which a priest was disqualified from practicing as a clergyman; and *Ex parte Garland,* 4 Wall. 333 (1867), in which lawyers were barred from the practice of law.

Section 12(f) imposes none of the burdens historically associated with punishment. As this Court held in *Flemming* v. *Nestor, supra,* at 617, "the sanction is the mere denial of a noncontractual governmental benefit. No affirmative disability or restraint is imposed," and Congress has inflicted "nothing approaching the 'infamous punishment' of imprisonment" or other disabilities historically associated with punishment.[10]

Congress did not even deprive appellees of Title IV benefits permanently; appellees can become eligible for Title IV aid at any time simply by registering late and thus "carry the keys of their prison in their own pockets." *Shillitani* v. *United States,* 384 U. S. 364, 368 (1966). A statute that leaves open perpetually the possibility of qualifying for aid does not fall within the historical meaning of forbidden legislative punishment.

### 2

Our inquiry does not end with a determination that § 12(f) does not inflict punishment in its historical sense. To ensure that the Legislature has not created an impermissible penalty not previously held to be within the proscription against bills of attainder, we must determine whether the challenged

---

[10] Appellees argue that the underpinnings of *Flemming* have been removed by *Goldberg* v. *Kelly,* 397 U. S. 254, 262 (1970), and *Mathews* v. *Eldridge,* 424 U. S. 319, 332 (1976). *Goldberg* held only that public assistance "benefits are a matter of statutory entitlement for persons qualified to receive them," 397 U. S., at 262, and that due process affords qualified recipients a pretermination evidentiary hearing to guard against erroneous termination. The Court stressed that "the crucial factor in this context . . . is that termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits." *Id.,* at 264 (emphasis in original). *Mathews* reached the same conclusion with respect to disability benefits. Even *Flemming* noted that the interest of a covered employee under the Social Security Act "fall[s] within the protection from arbitrary governmental action afforded by the Due Process Clause," 363 U. S., at 611, while holding that Congress' disqualification of certain deportees from receipt of Social Security benefits was not an attainder, *id.,* at 617.

statute can be reasonably said to further nonpunitive goals. *Nixon*, 433 U. S., at 475–476.

The legislative history reflects that § 12(f) represents the considered congressional decision to further nonpunitive legislative goals. Congress was well aware that more than half a million young men had failed to comply with the registration requirement.[11] The legislators emphasized that one of the primary purposes of § 12(f) was to encourage those required to register to do so.[12]

Conditioning receipt of Title IV aid on registration is plainly a rational means to improve compliance with the registration requirement. Since the group of young men who must register for the draft overlaps in large part with the group of students who are eligible for Title IV aid,[13] Congress reasonably concluded that § 12(f) would be a strong tonic to many nonregistrants.

Section 12(f) also furthers a fair allocation of scarce federal resources by limiting Title IV aid to those who are willing to meet their responsibilities to the United States by registering with the Selective Service when required to do so. As one Senator stated:

> "This amendment seeks not only to increase compliance with the registration requirement but also to insure the most fair and just usage of Federal education benefits.

---

[11] See, *e. g.*, 128 Cong. Rec. 18356 (1982) (remarks of Rep. Solomon); *id.*, at 9666 (remarks of Sen. Jepsen).

[12] See *id.*, at 18356 (remarks of Rep. Solomon); *id.*, at 18369 (remarks of Rep. Stratton); *id.*, at 9664 (remarks of Sen. Hayakawa); *id.*, at 9666 (remarks of Sen. Stennis); *ibid.* (remarks of Sen. Jepsen).

[13] The Military Selective Service Act, 50 U. S. C. App. § 453, requires certain males between the ages of 18 and 26 to register. Those who fail to register, though required to do so, are a significant part of the class to which Title IV assistance is otherwise offered. Title IV aid is available for a broad range of postsecondary educational programs at colleges, universities, and vocational schools. 20 U. S. C. § 1085(a); see n. 1, *supra*.

During these times of extreme budgetary constraints, times when even the most worthwhile programs are cut back drastically, this Government has every obligation to see that Federal dollars are spent in the most fair and prudent manner possible. . . . If students want to further their education at the expense of their country, they cannot expect these benefits to be provided without accepting their fair share of the responsibilities to that Government." [14]

Certain aspects of the legislation belie the view that § 12(f) is a punitive measure. Section 12(f) denies Title IV benefits to innocent as well as willful nonregistrants. Yet punitive legislation ordinarily does not reach those whose failure to comply with the law is not willful. Thus, in stressing that the legislation would reach unintentional violators, 128 Cong. Rec. 18355–18356 (1982) (remarks of Rep. Solomon); *id.*, at 18357 (remarks of Rep. Simon); *id.*, at 9666 (remarks of Sen. Stennis), proponents indicated that they intended to regulate *all* nonregistrants, rather than to single out intentional nonregistrants for punishment. In this same nonpunitive spirit, Congress also allowed *all* nonregistrants to qualify for Title IV aid simply by registering late, instead of choosing to punish willful nonregistrants by denying them benefits even if they registered belatedly.

We see therefore that the legislative history provides convincing support for the view that, in enacting § 12(f) Congress sought, not to punish anyone,[15] but to promote compliance

---

[14] 128 Cong. Rec. 9664–9665 (1982) (remarks of Sen. Hayakawa); see also *id.*, at 9664 (remarks of Sen. Mattingly); *id.*, at 18356 (remarks of Rep. Montgomery).

[15] Applying the third part of the *Nixon* test, the District Court concluded that § 12(f) is a punitive measure. But the District Court relied in part on the statements of legislators who opposed the statute because they thought the statute punished nonregistrants. 128 Cong. Rec. 18358–18359 (1982) (remarks of Rep. Edgar); *id.*, at 18359–18360 (remarks of

with the draft registration requirement and fairness in the allocation of scarce federal resources. Section 12(f) clearly furthers nonpunitive legislative goals.

C

Because § 12(f) does not single out an identifiable group that would be ineligible for Title IV aid or inflict punishment within the meaning of Bill of Attainder Clause, we hold that the District Court erred in striking down § 12(f) as an impermissible attainder.

III

Appellees assert that § 12(f) violates the Fifth Amendment by compelling nonregistrants to acknowledge that they have failed to register timely when confronted with certifying to their schools that they have complied with the registration law. Pointing to the fact that the willful failure to register within the time fixed by Proclamation No. 4771 is a criminal offense punishable under §§ 12(a) and (b), they contend that § 12(f) requires them—since in fact they have not registered—to confess to a criminal act and that this is "compulsion" in violation of their Fifth Amendment rights.

However, a person who has not registered clearly is under no compulsion to seek financial aid; if he has not registered, he is simply ineligible for aid. Since a nonregistrant is bound

---

Rep. Goldwater); *id.*, at 9666 (remarks of Sen. Durenberger). These statements are entitled to little, if any, weight, since they were made by opponents of the legislation. *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S. 384, 394–395 (1951).

The District Court also relied on several isolated statements expressing understandable indignation over the decision of some nonregistrants to show their defiance of the law. See 128 Cong. Rec. 18356 (1982) (remarks of Rep. Montgomery); *id.*, at 9665 (remarks of Sen. Hayakawa). But such statements do not constitute "the unmistakable evidence of punitive intent which . . . is required before a Congressional enactment of this kind may be struck down." *Flemming* v. *Nestor*, 363 U. S. 603, 619 (1960).

to know that his application for federal aid would be denied, he is in no sense under any "compulsion" to seek that aid. He has no reason to make any statement to anyone as to whether or not he has registered.

If appellees decide to register late, they could, of course, obtain Title IV aid without providing any information to their school that would incriminate them, since the statement to the school by the applicant is simply that he is in compliance with the registration law; it does not require him to disclose whether he was a timely or a late registrant. See n. 2, *supra*. A late registrant is therefore not required to disclose any incriminating information in order to become eligible for aid.

Although an applicant who registers late need not disclose that fact in his application for financial aid, appellants concede that a late registrant must disclose that his action is untimely when he makes a late registration with the Selective Service; the draft registration card must be dated and contain the registrant's date of birth. 32 CFR § 1615.4 (1983). This raises the question whether § 12(f) violates appellees' Fifth Amendment rights because they must register late in order to get aid and thus reveal to the Selective Service the failure to comply timely with the registration law. Appellees contend that, under our holding in *Lefkowitz* v. *Turley*, 414 U. S. 70, 83–84 (1973), the very risk that they will be ineligible for financial aid constitutes "compulsion" within the meaning of the Fifth Amendment.

In *Turley* we held that "the plaintiffs' [architects'] disqualification from public contracting for five years as a penalty for asserting a constitutional privilege is violative of their Fifth Amendment rights." *Id.*, at 83. However, nonregistrants such as appellees are not in the same position as potential public contractors in *Turley*. An 18-year-old male who refuses to register is, of course, subject to prosecution for failure to register, but he is not compelled by law to acknowledge his failure to comply. Only when he registers—includ-

ing a late registration—will he be asked to state his date of birth and thus acknowledge that he did not timely register.

None of these appellees has registered and thus none of them has been confronted with a need to assert a Fifth Amendment privilege when asked to disclose his date of birth. Unlike the architects in *Turley*, these appellees have not been denied the opportunity to register and in no sense have they been disqualified for financial aid "for asserting a constitutional privilege." *Ibid.*

It is well settled that, "in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself," *Minnesota* v. *Murphy*, 465 U. S. 420, 427 (1984); "[a]nswers may be compelled regardless of the privilege if there is immunity from federal and state use of the compelled testimony or its fruits in connection with a criminal prosecution against the person testifying," *Gardner* v. *Broderick*, 392 U. S. 273, 276 (1968). However, these appellees, not having sought to register, have had no occasion to assert their Fifth Amendment privilege when asked to state their dates of birth; the Government has not refused any request for immunity for their answers or otherwise threatened them with penalties for invoking the privilege as in *Turley*. Under these circumstances, § 12(f) does not violate their Fifth Amendment rights by forcing them to acknowledge during the registration process they have avoided that they have registered late.[16]

---

[16] The dissent reads *Marchetti* v. *United States*, 390 U. S. 39 (1968), and *Grosso* v. *United States*, 390 U. S. 62 (1968), to create in this case an exception to the normal rule requiring assertion of the Fifth Amendment privilege. In *Marchetti* and *Grosso*, however, anyone who asserted the privilege on a wagering return did not merely call attention to himself; the very filing necessarily admitted illegal gambling activity. Those cases are therefore clearly distinguishable on their facts. See *Grosso*, at 73 (BRENNAN, J., concurring); *United States* v. *Sullivan*, 274 U. S. 259, 263 (1927).

## IV

We conclude that § 12(f) does not violate the proscription against bills of attainder. Nor have appellees raised a cognizable claim under the Fifth Amendment.[17]

The judgment of the District Court is

*Reversed.*

JUSTICE BLACKMUN took no part in the decision of this case.

JUSTICE POWELL, concurring in part and concurring in the judgment.

I do not disagree with the holding or, indeed, with most of the Court's opinion. As I view this case, however, the bill of attainder issue can and should be disposed of solely on the ground that § 12(f) of the Military Selective Service Act, as added by § 1113(a) of the Department of Defense Authorization Act of 1983, is not *punitive* legislation.

Unless § 12(f) is punitive in its purpose and effect, there is no bill of attainder. *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 472 (1977). The term "punitive" connotes punishment as for a crime. Young men who knowingly have failed to comply with the registration requirements of the Selective Service Act have committed a crime

---

[17] Appellees also assert that § 12(f) violates equal protection because it discriminates against less wealthy nonregistrants. That argument is meritless. Section 12(f) treats all nonregistrants alike, denying aid to both the poor and the wealthy. But even if the statute discriminated against poor nonregistrants because more wealthy nonregistrants could continue to pay for their postsecondary educations, the statute must be sustained if rationally related to a legitimate Government interest. *Harris* v. *McRae*, 448 U. S. 297, 322–324 (1980). That standard is easily met here, because § 12(f) is rationally related to the legitimate Government objectives of encouraging registration and fairly allocating scarce federal resources. See *supra*, at 854.

for which the Act itself provides the only punishment.[1]  Section 12(f) is in no sense punitive; it authorizes no punishment in any normal or general acceptance of that familiar term. Rather, it provides a benefit at the expense of taxpayers generally for those who request and qualify for it.  There is no compulsion to request the benefit.  No minority or disfavored group is singled out by Congress for disparate treatment.

Section 12(f) applies broadly and equally to every male citizen and resident alien who upon attaining 18 years of age is required by Presidential order to register with the Selective Service.[2]  As its legislative history makes clear, § 12(f) was enacted to encourage compliance with the Military Selective Service Act, leaving punishment for failure to comply entirely to the provisions of the Act itself and to the normal enforcement provisions provided by law.  The Court observes that Congress by § 12(f) has adopted a "rational means" to encourage compliance with law.  *Ante,* at 854.  It is encouragement only; not compulsion.  Moreover, the interest of Government—indeed of the people of our country—

---

[1] Section 12 of the Military Selective Service Act provides, in relevant part:

"[A]ny person who . . . evades or refuses registration or service in the armed forces or any of the requirements of this title . . . or who in any manner shall knowingly fail or neglect or refuse to perform any duty required of him under or in the execution of this title, or rules, regulations, or directions made pursuant to this title . . . shall, upon conviction in any district court of the United States of competent jurisdiction, be punished by imprisonment for not more than five years or a fine of not more than $10,000, or by both such fine and imprisonment . . . ."  50 U. S. C. App. § 462(a).

[2] Young men in the United States are required only to *register* for military service when most of the other major countries of the world require this service.  In the North Atlantic Treaty Organization, for example, the following countries have compulsory military service: Belgium, Denmark, France, Greece, Italy, Netherlands, Norway, Portugal, Spain, Turkey, and West Germany.  Switzerland also has compulsory service as do—of course—all the Communist countries.  See The International Institute for Strategic Studies, The Military Balance 1983–1984 (1983).

in providing for national security is *compelling*. It has been recognized as such from the earliest days of the Republic.[3] The Preamble of the Constitution declares that one of the Framers' purposes was to "provide for the common defence."[4]

As I find that § 12(f) is punitive neither in its purpose nor in its effect, it is unnecessary in my view to reach the other arguments addressed by the Court on the bill of attainder issue.[5] I add, however, that I do not disagree with the

---

[3] The Federalist Papers, the essays arguing in favor of adoption of the Constitution, are replete with emphasis on the need for a national government to provide for defense by raising and maintaining armed forces. In John Jay's prescient Paper, No. 4, he observed: The "safety of the people of America against dangers from foreign forces depends not only on [our] forbearing to give *just* causes of war to other nations, but also on their placing and continuing themselves in such a situation as not to *invite* hostility . . . . It is too true, however disgraceful it may be to human nature, that nations in general will make war whenever they have a prospect of getting anything by it; [and] absolute monarchs will often make war when their nations are to get nothing by it . . . ." The Federalist No. 4, pp. 18–19 (J. Cooke ed. 1961) (emphasis in original).

Many of the opponents of the national union argued against "the *raising* of armies in time of peace." Responding to this argument, Alexander Hamilton answered that the "United States would then exhibit the most extraordinary spectacle which the world has yet seen—that of a nation incapacitated by its constitution to prepare for defence before it was actually invaded." The Federalist No. 25, p. 161 (J. Cooke ed. 1961). Hamilton also spoke of the danger of "expos[ing] our property and liberty to the mercy of foreign invaders and invit[ing] them, by our weakness, [to attack our country]." *Ibid.;* see also The Federalist No. 24 (A. Hamilton).

[4] Article I, § 8, of the Constitution expressly empowers Congress, in a single clause, "to pay the Debts and provide for the common Defense and general Welfare of the United States."

[5] In support of their contention that § 12(f) is a form of punishment, appellees cite *Ex parte Garland*, 4 Wall. 333 (1867), *Cummings* v. *Missouri*, 4 Wall. 277 (1867), and *United States* v. *Lovett*, 328 U. S. 303 (1946). In each of these cases, the Court held that " 'a legislative decree of perpetual exclusion' from a chosen vocation" was "punishment" for purposes of the Bill of Attainder Clause. *Id.*, at 316. Those cases are inapposite here. Section 12(f) does not restrict in any way appellees' choice of vocations or otherwise restrict the exercise of any constitutional right. It merely pro-

Court's reasoning, except to the extent it relies upon the Secretary's regulation that "interprets" the 1983 Act. In view of the compelling interest of Government, the constitutionality of § 12(f) does not depend upon this interpretation.

In sum, I join Parts I, II–B, III, and IV of the Court's opinion, and its judgment.

JUSTICE BRENNAN, dissenting.

For the reasons stated in Part II of JUSTICE MARSHALL's dissenting opinion, I too would affirm the judgment of the District Court on the ground that § 12(f) of the Military Selective Service Act, as added by § 1113(a) of the Department of Defense Authorization Act of 1983, compels those students seeking financial aid who have not registered with the Selective Service in timely fashion to incriminate themselves and thereby violates the Fifth Amendment.

JUSTICE MARSHALL, dissenting.

In 1980, after a 5-year suspension, the United States Government reinstituted registration for military service. By Presidential Proclamation, all men born after January 1, 1960, were required to register with the Selective Service System within 30 days of their 18th birthday.[1] The issue in this case is not whether Congress has authority to implement the law, but whether the method it has chosen to do so offends constitutional guarantees of individual rights. I conclude that § 12(f) fails to pass constitutional muster on two grounds. First, it compels self-incrimination, in violation of

---

vides that those men who wish to receive Title IV aid must first comply with the registration laws.

[1] Registration consists of completing SSS Form 1, available at any post office. The form requires the registrant to provide date of birth, sex, Social Security number, name, current and permanent mailing address, current telephone number, affirmation that the information provided is true, and date of that affirmation. A postal clerk date-stamps and initials the form, indicating whether the registrant produced identification. The registrant is under a continuing duty to notify Selective Service of changes in these data.

the Fifth Amendment. Second, it violates the right to equal protection of the laws guaranteed under the Due Process Clause of that Amendment.

## I

At the time of the enactment of the statute before the Court today, Congress understood that, of the draft-eligible population of 9,039,000 men, some 674,000 had failed to register, and many more registrants had failed to provide current mailing addresses.[2] Explanations for this widespread dereliction of legal duty have been as varied as the proposals to obtain full compliance. Testifying at oversight hearings, Government officials have told Congress that most nonregistrants are "uninformed of the requirement or are unaware of the importance of registration,"[3] while only "a relatively small number of nonregistrants have 'knowingly' neglected their duty."[4] Private organizations have testified that noncompliance with the Selective Service law "is grounded in registration's violation of individual conscience and its infringement of religious freedom";[5] that they oppose

---

[2] Oversight Hearing on Selective Service Prosecutions before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the House Committee on the Judiciary, 97th Cong., 2d Sess., 10 (1982) (hereinafter Oversight Hearing) (statement of Director of Selective Service, Maj. Gen. Thomas Turnage (Ret.)) (hereinafter Turnage); Attachment 17, *id.*, at 95–105 (Report of General Accounting Office). On the floor of the House the same day, Representative Solomon estimated 93% compliance and 700,000 nonregistrants. 128 Cong. Rec. 18355–18356 (1982).

[3] Oversight Hearing, at 11 (statement of Turnage); see also *id.*, at 7 (statement of Kenneth J. Coffey, Associate Director, (Military) Federal Personnel and Compensation Division, U. S. General Accounting Office).

[4] *Id.*, at 10 (statement of Turnage).

[5] *Id.*, at 47 (statement of Delton Franz for the National Interreligious Service Board for Conscientious Objectors). This group understands registration to be an integral part of conscription for war. Oversight Hearing, at 47–48. Cf. *Rostker* v. *Goldberg*, 453 U. S. 57, 68 (1981) ("Congress specifically linked its consideration of registration to induction, see, *e. g.*, S. Rep. No. 96–826, pp. 156, 160 (1980). Congressional judgments concerning registration and the draft are based on judgments concerning military operations and [combat] needs . . .").

draft registration as a "massive government surveillance system" in which the Government collects, stores, and exchanges data on individuals in violation of constitutional and statutory rights;[6] and that many cannot register as a matter of conscience because current regulations prohibit them from adjudicating their conscientious objector status prior to induction.[7]

Both the agency and Congress have crafted strategies to increase compliance with the law, such as increasing publicity programs, declaring a grace period when nonregistrants could comply without fear of prosecution, and posting lists of registrants in their local post offices.[8] To identify and locate nonregistrants, Selective Service has collected Social Security numbers on draft registration forms, and located nonregistrants through computer data bank sharing with the Department of Health and Human Services and through mail forwarding by the Internal Revenue Service.[9] Several per-

---

[6] Oversight Hearing, at 35 (statement of David Landau, Legislative Counsel, American Civil Liberties Union, Washington, D. C.) (expressing concern that data collected for, e. g., tax and Social Security purposes, upon a promise of confidentiality, are being used for enforcement purposes, by exemptions from the Privacy Act of 1974, which generally prohibits data-matching among Government agencies). See also n. 9, infra.

[7] Oversight Hearing, at 34–35 (statement of Landau) (contrasting regulations under prior draft, permitting application for conscientious objector status immediately after registration, and current regulations, presumptively classifying all registrants as available for induction, and permitting application for other status only within the 10-day period after receipt of a notice of induction). See 32 CFR §§ 1624.5(a), 1633.2(h), 1633.3 (1983). See also Oversight Hearing, at 42–43 (testimony of Rev. Barry Lynn, President, Draft Action).

[8] Id., at 81–82 (statement of Turnage).

[9] After a class action successfully challenged agency practice as a violation of the Privacy Act of 1974, § 2, note following 5 U. S. C. § 552a (statutory authorization required to collect Social Security numbers), Congress amended the Military Selective Service Act to require registrants to provide Social Security numbers. Department of Defense Authorization Act of 1982, Pub. L. 97–86, § 916, 95 Stat. 1129, 50 U. S. C. App. § 453. See Wolman v. United States, 542 F. Supp. 84 (DC 1982). Pub. L. 97–86 also authorized the President to require the Secretary of Health and Human

sons have been prosecuted for their failure to register, and the names of others have been forwarded to the Department of Justice for investigation and possible prosecution; the attendant publicity is seen by the agency as an effective method of communicating the duty to register and the seriousness of the failure to do so.[10]

It is in this context that Congress considered and adopted the statute before the Court, which was introduced on the floor by Representative Solomon and Senator Hayakawa as a rider to the Department of Defense Authorization Act of 1983. Section 1113(a) added a new subsection to the "Offenses and Penalties" section of the Military Selective Service Act. 50 U. S. C. App. § 462(f). The statute creates ineligibility for any form of assistance or benefit provided under Title IV of the Higher Education Act of 1965 (20 U. S. C. § 1070 *et seq.*) for any person required to register who fails to do so, 50 U. S. C. App. § 462(f)(1), and requires those persons to file with their postsecondary institution a "statement of compliance" with the draft registration requirement, 50 U. S. C. App. § 453. § 462(f)(2). As the Court holds today, the purpose of this statute was not to penalize nonregistrants, but to encourage compliance with the legal duty to provide information to the Selective Service System.

---

Services to furnish the Director of Selective Service, for enforcement purposes, the name, date of birth, Social Security number, and address of any person required to register for the draft. 50 U. S. C. App. § 462(e).

The agency also has considered cooperation with nonfederal data systems, such as state drivers' licenses, and private data systems on a fee basis. Oversight Hearing, at 84.

[10] *Id.*, at 13–14 (statement of Lawrence Lippe, Criminal Division, Department of Justice) (159 persons, self-identified nonregistrants or reported by others, referred to United States Attorneys for possible prosecution; Department "keeping in close touch" with Selective Service as it begins active enforcement program through use of Social Security and other records). The Court has granted certiorari in *Wayte* v. *United States*, 467 U. S. 1214 (1984), to consider the First Amendment challenge to the Government's program of investigating and prosecuting persons identified through their vocal opposition to draft registration.

It is tempting to succumb to the comfortable conclusions the majority draws after its glancing review of this legislation. After all, the Government has an explicit constitutional duty to provide for the common defense. "[I]n a free society," as Congress has declared, "the obligations and privileges of serving in the armed forces and the reserve components thereof should be shared generally, in accordance with a system of selection which is fair and just . . . ." § 451(c). The statute at issue has something to do with promoting full compliance with the registration law, which in turn promotes fairness in allocating burdens in the event of reinstitution of involuntary induction.   Much of the legislative rhetoric promoting § 12(f) seems unexceptional: youth should accept the obligations as well as the privileges of a democracy.[11] Nevertheless, mindful that "[i]t is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon," *Boyd* v. *United States*, 116 U. S. 616, 634–635 (1886), I must dissent.

## II

I do not have to disagree with the majority that § 12(f) does not violate the constitutional prohibition against bills of attainder.   That holding depends on construing the statute to permit late registration, *ante*, at 849–851, which in turn depends on construing Congress' intent as encouragement of compliance with the Selective Service registration requirement.   *Ante*, at 854.   The majority emphasizes the "nonpunitive spirit" of the legislation implicit in the fact that Congress "allowed *all* nonregistrants to qualify for Title IV aid simply by registering late." *Ante*, at 855.   Congress did not, however, grant immunity from criminal prosecution for that act of late registration.   Absent such a grant, § 12(f) must be struck because it compels self-incrimination.

The Fifth Amendment privilege against coerced self-incrimination extends to every means of government infor-

---

[11] See 128 Cong. Rec. 9665 (1982) (remarks of Sen. Hayakawa).

mation gathering. *Lefkowitz* v. *Turley*, 414 U. S. 70, 77 (1973); *Murphy* v. *Waterfront Comm'n*, 378 U. S. 52, 90 (1964) (WHITE, J., concurring); *Counselman* v. *Hitchcock*, 142 U. S. 547, 562 (1892). In our regulatory state, the line between permissible conditioning of the Government's taxing and spending power and impermissible Government coercion of information that presents a real threat of self-incrimination is not easy to identify. But I am confident the line has been crossed here.[12]

I do not take issue with the majority's conclusion, *ante*, at 856–857, that the Title IV application process itself does not require a student to divulge incriminating information to the educational institution.[13] The neutrality of this compliance verification system is central to the majority's acceptance of the permissible, regulatory purpose of the statute. However, our inquiry cannot stop there. Although § 12(f) does not coerce an admission of nonregistration, it does coerce registration with the Selective Service System, and hence individual reporting of self-incriminatory information directly to the Federal Government.

If appellees were to register with Selective Service now so that they could submit statements of compliance to obtain financial aid for their schooling, they would still be in violation of federal law, for, by registering late, they would not have submitted to registration "in accordance with any proclamation" issued under § 3 of the Military Selective Service Act,

---

[12] Of course, there are other "rights of constitutional stature whose exercise [government] may not condition by the exaction of a price," *Garrity* v. *New Jersey*, 385 U. S. 493, 500 (1967), such as the exercise of rights guaranteed by the First Amendment, but the posture of this appeal presents only a challenge to the burdens the legislation places on the exercise of Fifth Amendment rights.

[13] The compliance form does not require the student to state either the date of his birth or the date of his registration. The verification of registration, SSS Form 3A, required of all students after July 1, 1985, contains a "Date of Record," which would appear not to be the date of registration. 34 CFR §§ 668.26(b), (d)(1) (1983).

50 U. S. C. App. § 453.   § 462(f)(1).   Failure to comply with Selective Service registration requirements within 30 days of one's 18th birthday is a felony, punishable by imprisonment for up to five years and/or a fine of up to $10,000.   50 U. S. C. App. § 462(a).

A student who registers late provides the Government with two crucial links in the chain of evidence necessary to prosecute him criminally.   Cf. *Marchetti* v. *United States,* 390 U. S. 39, 48, and n. 9 (1968).   First, he supplies the Government with proof of two elements of a violation: his birth date and date of registration.   Second, and perhaps more importantly, he calls attention to the fact that he is one of the 674,000 young men in technical violation of the Military Selective Service Act.   Armed with these data, the Government need prove only that the student "knowingly" failed to register at the time prescribed by law in order to obtain a conviction.   50 U. S. C. App. § 462(a).   When students, such as appellees in this case, have acknowledged their awareness of their legal duty to register, App. 11–12, 24–25, the Government could prosecute the commission of a felony.

There can be little doubt that a late registration creates a "real and appreciable" hazard of incrimination and prosecution, and that the risk is not "so improbable that no reasonable man would suffer it to influence his conduct." *Brown* v. *Walker,* 161 U. S. 591, 599–600 (1896).   In their brief to this Court, for example, the appellants explicitly acknowledge that, although "failure to register within [30 days of one's 18th birthday] does not disqualify the registrant for Title IV aid, it is a criminal offense punishable under 50 U. S. C. App. (& Supp. V) 462."   Brief for Appellants 17, n. 7.   The Government thus appears to reserve the right to use information obtained by the leverage of withholding education aid as a basis for criminal prosecution.   Communications with registering men convey the same message.   For example, both the "Registration Form," SSS Form 1, and the "Acknowledgement Letter," SSS Form 3A, which is mailed to men as legal proof of compliance with Selective Service

registration requirements, advise registrants that the information they have provided "may be furnished to the . . . Department of Justice—for review and processing of suspected violations of the Military Selective Service Act . . . [and to the] Federal Bureau of Investigation—for location of an individual when suspected of violation of the Military Selective Service Act." Finally, recent Government actions have acknowledged the realistic potential for prosecution. For example, President Reagan declared a "grace period" in the first months of 1982, in which men could register *without* penalty.[14]  The obvious implication of this declaration is that once the grace period expires, late registrants will be prosecuted.  All of these governmental actions confirm the serious risk of self-incrimination and prosecution inherent in the act of late registration.[15]

---

[14] Registration Under the Military Selective Service Act, 18 Weekly Comp. of Pres. Doc. 8 (1982).  The grace period extended from January 7 through February 28, 1982.  N. Y. Times, Jan. 21, 1982, p. 14, col. 3. The Director of Selective Service, General Turnage, noted the correlation between extending immunity and encouraging registration compliance. Oversight Hearing, at 80–81 ("we have run clear off the chart").  See also *id.*, at 5–6 (400,000 registered as a result of 2-month grace period).

[15] Appellants' contention that the threat of incrimination is speculative and that therefore the Fifth Amendment is not implicated rests entirely on the assertion that under current (but concededly not "immutable") *policy*, prosecution for late registration is unlikely.  Reply Brief for Appellants 15–16; Tr. of Oral Arg. 14.  Just this Term, we acknowledged that "policy choices are made by one administration, and often reevaluated by another administration."  *United States* v. *Mendoza,* 464 U. S. 154, 161 (1984). Considering that the statute of limitations for Selective Service registration violations is five years from the date of compliance with the law, or, for nonregistrants, age 31, 50 U. S. C. App. § 462(d), as well as the unpredictability and wide range of public and political responses to the act of noncooperation with military service over the course of our history, a nonregistrant reasonably expects immunity for his compelled disclosures, not merely references to current policy.  The hard fact is that the penalty for late registration is precisely the same as the penalty for nonregistration: a possible prison term of five years and/or a possible fine of $10,000.

Having established that late registration is an incriminating act, the question to be asked is whether the Government has exercised its powers in a way that deprives appellees of the freedom to refrain from self-incrimination through late registration. *Garrity* v. *New Jersey*, 385 U. S. 493, 496 (1967); *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964). When the Government extracts incriminating information by the leverage of the threat of penalties, including the "threat of substantial economic sanction," *Lefkowitz* v. *Turley*, 414 U. S., at 82–83, the information is not volunteered. Thus, our cases have found coercion in statutes that extracted information through the threat of termination of state employment, *Garrity* v. *New Jersey, supra; Uniformed Sanitation Men Assn., Inc.* v. *Commissioner of Sanitation*, 392 U. S. 280 (1968); *Gardner* v. *Broderick*, 392 U. S. 273 (1968), through the threat of exclusion of a person from a profession, *Spevack* v. *Klein*, 385 U. S. 511 (1967), or through the threat of exclusion from participation in government contracts, *Lefkowitz* v. *Turley, supra.*

The threat of the denial of student aid is substantial economic coercion, and falls within the ambit of these cases. For students who had received federal education aid before enactment of § 12(f), termination of aid is coercive because it could force these students to curtail their studies, thereby forfeiting their investment in prior education and abandoning their hopes for obtaining a degree. Five of the six appellees in these cases fall into this category. App. 11–12, 24–25. Students who have not previously received federal aid may also be coerced by § 12(f). All students understand that entry into most professions and technical trades requires postsecondary education. For students who cannot otherwise afford this education, compliance with § 12(f) is coerced by the threat of foreclosing future employment opportunities. All of the appellees have stated that their own career plans require them to complete a college education. *Ibid.;* see also *id.*, at 16, 29.

By withholding federal aid and the opportunity to obtain postsecondary education, § 12(f) levies a substantial burden on students who have failed to register with the Selective Service System. This statutory provision coerces students into incriminating themselves by filing late registration forms. As the Court noted in *Garrity* v. *New Jersey, supra,* at 497, the "option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." I therefore completely agree with appellees that this enforcement mechanism violates the Fifth Amendment's proscription against self-incrimination as interpreted in our previous cases, and would strike the provision down on this ground alone.[16]

Moreover, I do not understand the Court today to dispute that § 12(f) raises serious Fifth Amendment problems. The Court concedes that it would be incriminating for appellees to register with the Selective Service now. *Ante,* at 857. The Court furthermore strongly suggests that appellees could exercise their Fifth Amendment rights if they did register, cf. *Garner* v. *United States,* 424 U. S. 648 (1976), and that the Government could not compel their answers at that point without immunization. *Ante,* at 858.[17] The majority incor-

---

[16] Of course, the general rule that a person must affirmatively assert the Fifth Amendment privilege or be deemed to have waived it, see, *e. g.,* *United States* v. *Kordel,* 397 U. S. 1, 7–10 (1970), is simply inapplicable in "the classic penalty situation [which excuses] the failure to assert the privilege." *Minnesota* v. *Murphy,* 465 U. S. 420, 435, and n. 7 (1984); see also *id.,* at 443–446 (MARSHALL, J., dissenting).

[17] Appellees would have two choices: complete the registration form, or note the Fifth Amendment privilege on the incomplete form. In either case, should appellees be prosecuted, they would argue that the card could not be introduced in evidence, and that the Government has the burden of proving that it made no use whatever of the incriminating disclosures. *Counselman* v. *Hitchcock,* 142 U. S. 547, 585–586 (1982). They might also argue that, having claimed the Fifth Amendment on their registration card, they can in good faith certify to the educational institution that they have complied with the Selective Service requirement, and receive Title

rectly assumes, however, that appellees must claim their privilege against self-incrimination before they can raise a Fifth Amendment claim in this lawsuit. What the majority fails to recognize is that it would be just as incriminating for appellees to exercise their privilege against self-incrimination when they registered as it would be to fill out the form without exercising the privilege.[18] The barrier to prosecuting Military Selective Service Act violators is not so much the Government's inability to discover a birth date or date of registration as the difficulty in identifying the 674,000 nonregistrants. The late registrant who "takes the Fifth" on SSS Form 1 calls attention to himself as much as, if not more than, a late registrant who marks down his birth date and date of registration.

In *Marchetti* v. *United States*, 390 U. S. 39 (1968), and the related case of *Grosso* v. *United States*, 390 U. S. 62 (1968), the Court faced a similar situation, in which complying with a federal registration requirement was the practical equivalent of confessing to a crime. In those cases, federal law required persons engaged in the business of accepting wagers to register and pay an occupational and excise tax. Compliance did not exempt the gambler from any penalties for conducting his business, which was widely prohibited under federal and state law, and the information obtained if he did comply was readily available to assist the authorities in enforcing those penalties. Petitioners failed to file the re-

---

IV aid. A statutory grant of immunity would far better promote Congress' aims.

[18] Of course, the Government can always draw an incriminating inference when a person claims a Fifth Amendment privilege. In the usual case, however, the Government has, for example, subpoenaed a witness to testify, and thus has already identified him. Whether he chooses not to appear, or appears but invokes the privilege, the Government knows of his refusal to cooperate. The appellees and other nonregistrants are not known to the Government. Therefore, invocation of the Fifth Amendment by appellees gives the Government a different quality of information.

quired forms because they feared that they would be prosecuted for gambling if they revealed their activities to the Federal Government; they were convicted of willful failure to do so. The Court reversed the convictions, holding invalid a "statutory system . . . utilized to pierce the anonymity of citizens engaged in criminal activity." *Grosso* v. *United States, supra,* at 76 (BRENNAN, J., concurring). The Court recognized that by filing an incomplete form, or explicitly invoking their Fifth Amendment privilege on the form itself, petitioners would incriminate themselves by informing the Government that they were involved in illegal gambling activities. The Court therefore ruled that petitioners could exercise their Fifth Amendment rights by making "a 'claim' by silence," *Garner* v. *United States, supra,* at 659, n. 11, and refraining from filing the required forms.

The *Marchetti-Grosso* Court based its holding in part on the fact that the information-gathering scheme was directed at those "inherently suspect of criminal activities." *Marchetti* v. *United States, supra,* at 47. Here, it is fair to say that the Government does not expect that most registrants will be in violation of the Selective Service laws. At first blush, the required information might therefore seem less like the *Marchetti-Grosso* inquiries and more like income tax returns, "neutral on their face and directed at the public at large." *Albertson* v. *Subversive Activities Control Board,* 382 U. S. 70, 79 (1965). In *Garner* v. *United States, supra,* at 661, the Court noted that the great majority of persons who file income tax returns do not incriminate themselves by disclosing the information required by the Government. Because the Government has no reason to anticipate incriminating responses when requiring citizens' self-reporting of answers to neutral regulatory inquiries, our cases put the burden of asserting a Fifth Amendment privilege on the speaker, and the right to make a claim by silence is not available.

To adopt this analogy, however, is to ignore the actual case or controversy before the Court. When Congress passed § 12(f), its focus was assuredly *not* prospective. As the majority explains, Congress forged the link between education aid and Selective Service registration in order to bring into compliance with the law the 674,000 existing nonregistrants, including the six appellees in these cases. *Ante,* at 849–850, and n. 4. Although as a general matter it is correct to say that registration is like an income tax return (neutral on its face and directed to the (male) population at large), § 12(f)-compelled *late* registration is directed to a group inherently suspect of criminal activity, squarely presenting a *Marchetti* issue.

In my view, therefore, young men who have failed to register with Selective Service, and at whom § 12(f) was substantially aimed, are entitled to the same "claim by silence" as Marchetti and Grosso. But these students are compelled to forgo that right under this statutory scheme. The defect in § 12(f) is that it denies students seeking federal aid the freedom to withhold their identities from the Federal Government. If appellees assert their Fifth Amendment privilege by their silence, they are penalized for exercising a constitutional right by the withholding of education aid. If they succumb to the economic coercion either by registering, or by registering but claiming the privilege as to particular disclosures, they have incriminated themselves.

Thus, I cannot accept the majority's view that appellees' Fifth Amendment claims are not ripe for review. If the Court is suggesting that appellees must wait until they are prosecuted for late registration before adjudication of their claim, that "is, in effect, to contend that they should be denied the protection of the Fifth Amendment privilege intended to relieve claimants of the necessity of making a choice between incriminating themselves and risking serious punishments for refusing to do so." *Albertson* v. *Subversive*

*Activities Control Board, supra,* at 76. As in *Albertson,* where a federal statute required members of the Communist Party to register, appellees are put to the choice of registering without a decision on the merits of their constitutional privilege claim, or not registering and suffering a penalty. A nonregistrant's most efficacious opportunity to exercise his privilege against self-incrimination without simultaneously compromising that privilege is to challenge § 12(f) anonymously, as appellees have done in this case.

In sum, appellees correctly state that this law coerces them into self-incrimination in the face of a substantial risk of prosecution. That risk should be cured by a statutory grant of immunity. See *Minnesota* v. *Murphy,* 465 U. S. 420, 429, and 435–436, n. 7 (1984) (opinion of the Court); *id.,* at 442 (MARSHALL, J., dissenting). The grant would confirm that Congress' intent in passing § 12(f) was not to punish nonregistrants, but to promote compliance with the registration requirement. The Government "may validly insist on answers to even incriminating questions . . . as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination." *Minnesota* v. *Murphy, supra,* at 436, n. 7, and cases cited therein. See also *Counselman* v. *Hitchcock,* 142 U. S., at 564–565, 585–586. The Government has a substantial interest in obtaining information to assure complete and accurate Selective Service registration, but obtaining it under the compulsion of § 12(f), which is "capable of forcing the self-incrimination which the Amendment forbids," *Lefkowitz* v. *Cunningham,* 431 U. S. 801, 806 (1977), is unconstitutional in the absence of immunity for the compelled disclosures. If Congress enacted § 12(f) to encourage compliance with registration requirements, and not to identify and punish late registrants, the constitutional legislative purpose would be fulfilled without implicating students' Fifth Amendment privilege against self-incrimination.

## III

The aspect of the law that compels self-incrimination is doubly troubling because a discrete subgroup of nonregistrants bears the brunt of the statute. The Federal Government has a duty under the Due Process Clause of the Fifth Amendment to guarantee to all its citizens the equal protection of the laws. *Rostker* v. *Goldberg*, 453 U. S. 57 (1981); *Bolling* v. *Sharpe*, 347 U. S. 497 (1954). Section 12(f), in my view, violates that constitutional duty.

The majority's superficial, indeed cavalier, rejection of appellees' equal protection argument, *ante*, at 858, n. 16, demonstrates once again a "callous indifference to the realities of life for the poor," *Flagg Bros., Inc.* v. *Brooks*, 436 U. S. 149, 166 (1978) (MARSHALL, J., dissenting), and the inadequacy of the Court's analytical structure in this area of law. We should look to "the character of the classification in question, the relative importance to individuals in the class discriminated against of the governmental benefits that they do not receive, and the asserted state [or federal] interests in support of the classification." *Dandridge* v. *Williams*, 397 U. S. 471, 521 (1970) (MARSHALL, J., dissenting). See also *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 98–99 (1973) (MARSHALL, J., dissenting). As a majority of the Court has noted, "the courts are called upon to decide whether Congress, acting under an explicit constitutional grant of authority, has by that action transgressed an explicit guarantee of individual rights which limits the authority so conferred," and labels "may all too readily become facile abstractions used to justify a result." *Rostker* v. *Goldberg, supra*, at 70.

The majority is factually incorrect when it states that the statute at issue in this case treats all nonregistrants alike. "Only low-income and middle-income students will be caught in this trap," as was pointed out in floor debate on § 12(f). 128 Cong. Rec. 18356 (1982) (remarks of Rep. Mof-

fett). Title IV education aid is awarded on the basis of need. See 20 U. S. C. § 1089 (need analysis) and accompanying regulations. Although federal education aid is significant for a large segment of postsecondary students, more than three out of four postsecondary students dependent on family incomes under $6,000 are receiving Title IV aid. U. S. Dept. of Education, Office of Student Financial Assistance, OSFA Program Book 18 (July 1981) (hereinafter OSFA Program Book).[19] In contrast, only 8% of students dependent on families with incomes over $30,000 receive any Department of Education-funded financial aid. *Ibid.* In the Basic Educational Opportunity Grant Program (now known as Pell Grants), 83.1% of the recipients are dependent on families with incomes of less than $12,000. *Id.*, at 27. In the State Student Incentive Program, 69.4% of the recipients are in this category. *Id.*, at 78 (figures for fiscal year 1977). It is therefore absurd to state that § 12(f) "treats all nonregistrants alike, denying aid to both the poor and the wealthy." *Ante*, at 859, n. 17. The wealthy do not require, are not applying for, and do not receive federal education assistance, and therefore are not subject to the requirement that they file statements that they have complied with the Selective Service registration requirement, nor to the economic compulsion to provide incriminating facts to the Government in the act of late registration.[20] Yet the obligation

---

[19] Although the OSFA Program Book is published annually, we cite to the 1981 edition because it contains the most recent statistics for distribution of federal education aid by income and ethnic group. Unless otherwise noted, the figures reported in the 1981 OSFA Program Book are for the 1978–1979 academic year.

[20] Students who are members of ethnic minority groups are especially reliant on federal assistance to obtain training beyond high school. 56.7% of Basic Educational Opportunity Grant recipients, 52.1% of Student Educational Opportunity Grant recipients, and 46.4% of Work Study grants recipients, are ethnic minorities, OSFA Program Book 27, 65, 74, although these students are still a small percentage of the postsecondary student

to comply with the law, and the failure to do so, know no economic distinction.

As appellees argued in the District Court and in their brief to this Court, by linking draft compliance with education aid, Congress has created a *de facto* classification based on wealth,[21] and has laid an unequal hand on those who have committed precisely the same offense of failing to register with the Selective Service within 30 days of their 18th birthday. Cf. *Yick Wo* v. *Hopkins*, 118 U. S. 356, 373–374 (1886). Further, § 12(f) clearly burdens these individuals' interest in access to education, which "provides the basic tools by which individuals might lead economically productive lives to the benefit of us all." *Plyler* v. *Doe*, 457 U. S. 202, 221 (1982). Many of our cases have stressed the extraordinary nature of

---

body. For example, only 14.3% of the college students in 1982 were minorities. U. S. Dept. of Commerce, Statistical Abstract of the United States 161, Table 258 (1984). Section 12(f) also penalizes only male students. In *Rostker* v. *Goldberg*, 453 U. S. 57 (1981), the Court held that gender differences influence combat roles and military needs and therefore justify male-only draft registration. While I disagreed with that conclusion, noting that the statute "thereby categorically excludes women from a fundamental civic obligation," *id.*, at 86, even had I joined the Court I would protest the extension of this gender classification into the area of federal education assistance, an area in which gender is irrelevant and any classification based on gender is constitutionally objectionable. Men and women are similarly situated for purposes of the allocation of education funds. That principle should not be undermined by co-opting education law to enforce criminal laws.

[21] The defects of the wealth classification are heightened because the classification is also based on youth. We would ignore our responsibility if we failed to give the statute before us most careful scrutiny. The young persons affected by this statute are in the very process of forging a means to establish their independence. Although enfranchised, they are less able to exercise their vote because of their transience and, frequently, state laws burdening student voter registration. See, *e. g.*, N. Y. Elec. Law § 5–104 (McKinney 1978). To my mind, they are "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *San Antonio Independent School District* v. *Rodriguez*, 411 U. S. 1, 28 (1973) (opinion of the Court); *United States* v. *Carolene Products Co.*, 304 U. S. 144, 152, n. 4 (1938).

the individual's interest in education. See, *e. g.*, *Plyler* v. *Doe, supra,* at 234, 236 (BLACKMUN, J., concurring); *Vlandis* v. *Kline,* 412 U. S. 441, 459 (1973) (WHITE, J., concurring in judgment). I continue to believe that interest to be fundamental because of the relationship education bears to our most basic constitutional values. See, *e. g.*, *Martinez* v. *Bynum,* 461 U. S. 321, 346 (1983) (dissenting opinion); *Plyler* v. *Doe, supra,* at 230–231 (concurring opinion). I have written at length to explain my position, *San Antonio Independent School District* v. *Rodriguez,* 411 U. S., at 110–117, and need not repeat the analysis here.[22]

Declining to look at how § 12(f) actually works, the majority is satisfied not only that the statute does not disfavor any classification, but also that it "is rationally related to the legitimate Government objectives of encouraging registration and fairly allocating scarce federal resources." Ante, at 859, n. 17. But can Congress' admittedly important interest in enforcing the Military Selective Service Act justify unleashing a dual system for its enforcement? While all nonregistrants are subject to imprisonment and fine, only those nonregistrants who qualify for education aid based on need are subjected both to that criminal process and to the economic compulsion imposed by the loss of financial aid. Federal courts cannot overlook the fact that Congress' "understandable indignation" at nonregistrants, *ante,* at 856, n. 15, focused on a discrete subgroup.

If we accept that the purpose of § 12(f) is to promote compliance with Selective Service registration, then we must also consider the fit between the law and its object. The

---

[22] Where our prior cases have focused particularly on the extraordinary importance to the individual of elementary and secondary education, our concern that burdening access to education creates permanent class distinctions and political disadvantage is equally relevant here. Postsecondary education is the necessary prerequisite to pursuit of countless vocations, both professional and technical. Deprivation of a livelihood is too great a price to pay for the assertion of the Fifth Amendment privilege. *Spevack* v. *Klein,* 385 U. S. 511 (1967).

universe of nonregistrants at the time of this legislation was understood to be more than half a million men. The majority does not offer any support for its statement that "[t]hose who fail to register . . . are a significant part of the class to which Title IV assistance is otherwise offered." *Ante*, at 854, n. 13. See Tr. of Oral Arg. 11 (Government has no information on number of nonregistrants who are receiving financial aid).

We should reject the suggestion that the putative age-group overlap between the group required to register with Selective Service and the group pursuing postsecondary education is sufficient justification for this law. While it is true that the Equal Protection Clause does not require that legislatures resolve either all or none of a problem, *Railway Express Agency, Inc.* v. *New York*, 336 U. S. 106, 110 (1949), it is also true that "nothing opens the door to arbitrary action so effectively as to allow . . . officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected." *Id.*, at 112–113 (Jackson, J., concurring). When the law lays an unequal hand on those who have committed precisely the same offense, the discrimination is invidious. Cf. *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942). Further, the adverse consequences of § 12(f) on an identifiable group are inevitable, creating a strong inference that the adverse consequences were desired. Cf. *Personnel Administrator of Massachusetts* v. *Feeney*, 442 U. S. 256, 279, n. 25 (1979).

The floor debate provides support for that inference. The House sponsor of § 12(f), Representative Solomon, acknowledged criticism that the amendment singled out the disadvantaged. "Now, maybe we are discriminating against the poor. And if we are, I guarantee I am going to come back with legislation on this floor tomorrow and the next day and the next day and every day of this session with amendments that will prohibit any funds from being used for the Job

Training Act if they are not registered, for any unemployment compensation insurance if they are not registered, and for any kind of taxpayers' money if they are not registered." 128 Cong. Rec. 18366 (1982).[23] "They" are the poor—a discrete subgroup of persons who receive financial benefits from their Government. This animus cannot be rationalized away by the argument that Congress has an important interest in the fair allocation of scarce resources. Entitlement programs of far greater scope than education aid—for example, farm price supports—confer benefits to a broader spectrum of economic interests, while much of our tax law—oil depletion allowances, accelerated depreciation, capital gains, property owners' deductions—favors the more advantaged. We can well imagine the effective political resistance that would follow Congress' conditioning rich persons' Government benefits and entitlements. I can think of no constitutionally valid purpose that would justify singling out the less advantaged for special law enforcement attention.

Congress has enacted other, constitutional means to enforce the Selective Service registration laws, means that do not involve invidious discrimination among subclasses of lawbreakers. The right to an education is too basic, and

---

[23] See also Job Training Partnership Act, Pub. L. 97–300, § 504, 96 Stat. 1399, 29 U. S. C. § 1504. The Act is a "new job training program for the drop-out youth who are not prepared for employment, for welfare recipients who need training to escape from dependency, [and] for the economically disadvantaged who cannot compete in the labor market without help," as well as for dislocated workers. S. Rep. No. 97–469, p. 1 (1982). Title 29 U. S. C. § 1504 requires the Secretary of Labor to "insure that each individual participating in any program established under this Act . . . has not violated section 3 of the Military Selective Service Act" by not registering. See also Oversight Hearing, at 85 (remarks of Turnage) (positing linking compliance requirement with federal employment, unemployment compensation, Veterans' Administration dependency benefits, Social Security survivor's benefits, and Comprehensive Employment and Training Act programs).

the governmental need to discriminate among nonregistrants is too tenuous for this Court to hide behind the screen of a rational relationship test to permit the misuse of nondiscriminatory education policy to meet the unrelated goals of military service.

## IV

As the District Court noted, the issue before us "turns not on whether the registration law should be enforced, but in what manner." *Doe* v. *Selective Service System,* 557 F. Supp. 937, 950 (1983). For the reasons stated above, I find § 12(f) of the Military Selective Service Act violative of the Fifth Amendment, both because it compels self-incrimination, and because it violates due process by denying persons the equal protection of the laws. I respectfully dissent.