# Scope of the Environmental Protection Agency's Discretion to Adopt Any One of Three Alternative Interpretations of the Mitchell-Conte Amendment to the Clean Air Act

Based on *Chevron U S.A. Inc. v Natural Resources Defense Counsel, Inc.*, the Environmental Protection Agency has the discretion to adopt any one of three alternative EPA-suggested interpretations of the 1988 Mitchell-Conte Amendment to the Clean Air Act.

April 14, 1989

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF MANAGEMENT AND BUDGET

This memorandum responds to your request of November 8, 1988[1], that this Office resolve a dispute between the Office of Management and Budget ("OMB") and the Environmental Protection Agency ("EPA") as to whether EPA has the discretion to adopt any one of three alternative EPA-suggested interpretations of the Mitchell-Conte Amendment. EPA argues that it possesses such authority, while OMB argues that only the first of the three suggested interpretations is legally permissible. For the reasons set forth below, we conclude that EPA does possess the authority to adopt either the second or third alternative interpretation, in addition to the first interpretation.

## I. Background[2]

The Clean Air Act Amendments of 1970, Pub. L. No. 91-604, § 1, 84 Stat. 1676 ("CAA") directed EPA to establish primary and secondary National

---

[1] Letter for Hon. Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, from Alan Charles Raul, General Counsel, Office of Managment and Budget (Nov 8, 1988) ("OMB Letter").

[2] The following background discussion is derived in large part from EPA, State Implementation Plans; Attainment Status Designations; Proposed Rulemaking and Policy, 53 Fed. Reg. 20,722, 20,734 (1988) (codified at 40 C F.R pt 81) We do not address at length the question whether constitutional issues are raised by the regulatory structure established pursuant to section 107 of the Clean Air Act, under which state officials prepare lists of areas failing to meet ambient air quality standards — lists that EPA employs as the basis for the imposition of regulatory strictures under the Clean Air Act. *Cf Buckley v Valeo*, 424 U.S. 1, 140-41 (1976) (only Officers of the United States, appointed in the manner provided for in the Appointments Clause of the Constitution, Article II, Section 2, Clause 2, may constitutionally exercise "significant authority pursuant to the laws of the United States")

Ambient Air Quality Standards ("NAAQS") to protect the public health and the public welfare, respectively. Under these amendments, the states were directed to develop and adopt State Implementation Plans ("SIPs") to attain and maintain the NAAQS. Specifically, section 110(a) of the CAA required the states to develop and adopt SIPs that would attain the NAAQS in most areas by 1975, with some extensions until 1977, pursuant to section 110(e) of the CAA.

Section 107(d) of the CAA Amendments of 1977, § 197(d), 91 Stat. 685, 687-89 (codified at 42 U.S.C. § 7407(d)) ("section 107(d)"), required that each state identify all areas within its boundaries that had not attained the NAAQS by August 7, 1977. The EPA was required to promulgate these lists within 60 days, with such modifications as EPA deemed necessary and after giving the states notice and opportunity to comment. The EPA promulgated most of these designations on March 3, 1978. Attainment Status Designations, 43 Fed. Reg. 8962 (1978) (codified at 40 C.F.R. pt. 81). Part D of the CAA, 42 U.S.C. §§ 7501-7508 ("Part D"), required that those areas designated as "nonattainment" in 1978 submit SIP revisions by January 1, 1979 that demonstrated attainment of the NAAQS by December 31, 1982. EPA could approve a state's application for an extension of the attainment deadline until December 31, 1987, upon a proper demonstration that attainment of the NAAQS was not possible by the December 1982 deadline, despite the use of all "reasonably available" measures.

EPA initially took the position that it could modify an area's promulgated designation at any time when warranted by evidence of nonattainment of the NAAQS, not only upon review of the affected state's original recommendations. However, in *Bethlehem Steel Corp. v. EPA*, 723 F.2d 1303 (7th Cir. 1983), the U.S. Court of Appeals for the Seventh Circuit held that EPA could not unilaterally modify an air quality area designation under section 107(d) after having promulgated statutorily-required designation lists, unless the concerned state had requested such a modification. EPA subsequently, as a matter of practice, acquiesced in the reasoning of *Bethlehem Steel* in all states, not just those in the Seventh Circuit. 53 Fed. Reg. at 20,724. Consistent with such acquiescence, absent a request from the affected state, EPA did not redesignate as nonattainment an area which had originally been designated as attainment or unclassifiable, regardless of the evidence of violation of the NAAQS. *Id.*

In November 1987, EPA announced it would develop a program to address the likelihood that many areas of the country would not attain the NAAQS for ozone and carbon monoxide by the statutorily-required CAA deadline of December 31, 1987. State Implementation Plans; Approval of Post-1987 Ozone and Carbon Monoxide Plan Revisions for Areas Not Attaining the National Ambient Air Quality Standards; Notice, 52 Fed. Reg. 45,044 (1987). Among the matters EPA proposed for comment was the issuance of calls to the states for revised SIPs in any geographical location

where recent monitoring data showed violations, irrespective of the area's past designation as attainment or nonattainment. EPA also proposed adjusting the boundaries of nonattainment areas to add all counties in a metropolitan statistical area ("MSA") or a consolidated MSA ("CMSA"), whether the areas being annexed to the preexisting nonattainment area showed violations or not. *Id.* at 45,044, 45,054-55.

In January 1988, Congress enacted the Mitchell-Conte Amendment ("MCA") to the Fiscal 1988 Continuing Resolution, Pub. L. No. 100-202, 101 Stat. 1329, 1329-199 (1987). The bulk of the MCA temporarily prohibits (during the period prior to August 31, 1988) the EPA from imposing CAA "restriction[s] or prohibition[s] on construction, permitting, or funding" of industrial facilities in geographic areas that have not attained specified clean air standards by December 31, 1987. The last sentence of the MCA reads:

> Prior to August 31, 1988 the Administrator of the Environmental Protection Agency shall evaluate air quality data and make determinations with respect to which areas throughout the nation have attained, or failed to attain, either or both of the national primary ambient air quality standards referred to in subsection (a) *and shall take appropriate steps to designate those areas failing to attain either or both of such standards as nonattainment areas within the meaning of part D of title I of the Clean Air Act.*

*Id.* (emphasis added).

On June 6, 1988, the EPA issued a notice of proposed rulemaking setting forth three alternative interpretations ("alternative interpretations") of the MCA's last sentence: (1) EPA could identify those areas that failed to obtain the ozone or carbon monoxide NAAQS (the subsection (a) NAAQS) by December 31, 1987, but not attach any regulatory consequences to such factual determinations, 53 Fed. Reg. at 20,725; (2) EPA could unilaterally (without a request by the affected state) redesignate as nonattainment those areas that failed to attain either one of the two NAAQS, regardless of their current designations, with the redesignations imposing regulatory obligations under Part D, *id.* at 20,725-26; and (3) EPA could unilaterally redesignate as nonattainment only those areas that are currently designated as attainment but that in fact failed to attain the NAAQS, with the redesignations imposing regulatory Part D obligations, *id.* at 20,726.[3] The third interpretation differs from the second only

---

[3] EPA stated that under the second alternative interpretation, the MCA would be construed as overriding *Bethlehem Steel. Id* at 20,725-26 That is not precisely correct since the Seventh Circuit was not inter-

Continued

"insofar as EPA would not attach ... (regulatory Part D) consequences to confirmation of the nonattainment status of areas already designated as nonattainment." *Id.* at 20,726-27.

OMB subsequently took the position that only the first of the three alternatives set forth above constitutes a permissible construction of the MCA's last sentence within the meaning of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984) (where a statute is silent or ambiguous as to a particular issue, and congressional intent cannot be ascertained, a reviewing court may not disturb an agency's "reasonable" interpretation of the statutory provision in question). The EPA General Counsel's Office disagreed, contending that all three interpretations satisfied *Chevron's* "reasonableness" criterion. OMB requested that the Office of Legal Counsel resolve this dispute. *See* OMB Letter at 2.

## II. Discussion

### A. Reasonable Construction of the MCA's Last Sentence

In order to assess this question, we first briefly examine section 107(d). Section 107(d) deals with the designation of nonattainment areas in the following fashion. For the purposes of imposing CAA regulatory obligations "under part D," section 107(d)(1) requires each state to submit to the EPA Administrator a list of nonattainment areas, *viz.*, a list "identifying those air quality regions, or portions thereof, ... in such State which on [August 7, 1977]" do not meet certain specified air quality standards.[4] "Not later than sixty days after submittal of the list under paragraph (1) of this subsection the Administrator shall promulgate each such list with such modifications as he deems necessary. Whenever the Administrator proposes to modify a list submitted by a State, he shall notify the State and request all available data relating to such region or portion, and provide such State with an opportunity to demonstrate why any proposed modification is inappropriate." § 107(d)(2). Moreover, "[a] State may from time to time review, and as appropriate revise and resubmit, the list required under this subsection. The Administrator shall consider and promulgate such revised list in accordance with this subsection." § 107(d)(5). Finally, for management reasons, the states may from time to

---

[3] (.. continued)
preting the MCA. In other words the time limits and state participation features Judge Posner found applicable under the Clean Air Act still obtain in all cases brought under section 107(d), except that, as we discuss *infra*, with respect to the two NAAQS that are also the subject of the MCA, the EPA has additional unilateral authority not subject to the time and State-initiation requirements of section 107(d) *Cf* David P Currie, *Air Pollution Federal Law and Analysis* § 6.04 at 6-12 (1981) Adoption of the third alternative interpretation should be similarly understood.

[4] Those standards, enumerated in 42 U.S C § 7407(d)(1)(A)-(E), are identified as benchmarks for nonattainment status in 42 U.S.C. § 7501(2)

time redesignate air quality control regions (the regions within which attainment is evaluated) within their borders, subject to the approval of the Administrator. § 107(e).

In *Bethlehem Steel*, the Seventh Circuit construed section 107(d)(2) as not authorizing EPA unilaterally to modify a list of state-submitted nonattainment designations *after* the initial sixty day period following submittal had run. The court found that the term *"[w]henever* the Administrator proposes to modify a list submitted by a State" merely referred to EPA's authority to modify a state's list "in every instance" EPA might choose *within* the initial sixty day notification period — not as suggesting that EPA should be able to modify a list at any future point in time. 723 F.2d at 1305 (emphasis added). Nevertheless, as we discuss below, we do not believe *Bethlehem Steel* is dispositive of the issue whether EPA has additional unilateral authority under the MCA.

In evaluating the MCA, we start as always with the language of the statutory text. The MCA's last sentence requires that EPA's Administrator "make determinations with respect to which areas throughout the nation have attained, or failed to attain, either or both of" two specified NAAQS (for ozone and carbon monoxide). In light of those determinations, the Administrator *"shall evaluate* air quality data *and make determinations* with respect to which areas throughout the nation have attained, or failed to attain, [specified NAAQS] ... *and shall take appropriate steps to designate* those areas failing to attain either or both of such [NAAQS] as nonattainment areas within the meaning of part D of title I of the Clean Air Act." 101 Stat. at 1329-199 (emphasis added).

Neither the MCA nor its legislative history[5] expressly addresses what is

---

[5] Two isolated congressional statements regarding the MCA's last sentence are, under traditional norms of statutory construction, not dispositive of the statute's meaning.

*First*, the isolated statement by Representative Dingell (the only floor statement bearing directly on the MCA's last sentence) that the MCA "make[s] a significant change in the Clean Air Act," 133 Cong. Rec 34,026 (1987), is "entitled to little, if any, weight" in discerning legislative intent, because Representative Dingell was arguing against the MCA. *Selective Serv Sys. v Minnesota Pub. Interest Research Group*, 468 U.S. 841, 855-56 n.14 (1984); *see National Woodwork Mfgs Ass'n v. NLRB*, 386 U.S 612, 639-40 (1967), *NLRB v Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U S. 58, 66 (1964); *Schwegmann Bros. v. Calvert Distillers Corp*, 341 U S. 384, 394-95 (1951). *See also* Comp. Gen Op B-208593 6 at 5 (1988), (such comments "do not constitute an authoritative expression of congressional intent," since his remarks were made against the MCA and "were not part of a colloquy with the amendment's sponsor")

*Second*, as EPA points out, Senator Mitchell's *post-enactment* letter of August 5, 1988 to the EPA Administrator, "stat[ing] that the Mitchell-Conte Amendment was intended to override *Bethlehem Steel* and EPA's policy permanently discharging Part D obligations upon EPA's approval of a Part D SIP," has "little value as legislative history" Letter for Douglas W Kmiec, Assistant Attorney General, Office of Legal Counsel, from Lawrence J. Jensen, General Counsel, EPA, at 4 (Jan 13, 1989) ("EPA Letter") Post-enactment statements made by individual legislators or congressional committees lack legal force, because at best they are evidence only of what individual legislators' intentions may have been *See, e g*, *Regional Rail Reorganization Cases*, 419 U S. 102, 132 (1974) (post-enactment statements "'represent only the personal views of ... legislators,'" and "however explicit, [they] cannot serve to change the legislative intent of Congress expressed before the Act's passage"); *TVA v. Hill*, 437 U S. 153, 193 (1978); 2A Sutherland, Statutory Construction 48 16 (Sands ed. 1973).

109

meant by the term "tak[ing] appropriate steps to designate,"[6] and this term is not self-explanatory. Nevertheless, since no mention is expressly made of a state role in the MCA's last sentence, since Part D — which is not premised on a state role — is expressly referenced in the MCA rather than Part A which contains the state role construed in *Bethlehem Steel*, and since even absent the MCA there was a reasonable argument that the EPA had unilateral authority,[7] we believe it would not be unreasonable for EPA to interpret the MCA language to authorize the EPA unilaterally to "take appropriate steps" — to make nonattainment designations with respect to the two specified NAAQS without a request from the states. That the existence of unilateral EPA authority to make these specific nonattainment designations could reasonably be deemed consistent with the MCA's last sentence is also supported by the initial part of that sentence, which plainly directs EPA, on its own, to evaluate air quality data and make determinations of attainment or nonattainment. The making of unilateral nonattainment designations could reasonably be viewed as an action logically following on the heels of EPA's evaluation of data and making of air quality determinations for the two NAAQS.

Finally, we also note that an interpretation of the MCA which authorizes EPA to make nonattainment designations unilaterally without first having to rely on action by the states avoids a constitutionally problematic result. *Cf. Buckley v. Valeo*, 424 U.S. 1, 126, 140-41 (1976) (only Officers of the United States, appointed in the manner provided for in the Appointments Clause of the Constitution, may constitutionally exercise "significant authority pursuant to the laws of the United States"). Accordingly, the second and third interpretations are in harmony with the principle of statutory construction that a statute should be read in a manner that avoids constitutional prob-

---

[6] 101 Stat at 1329-199 The term "nonattainment area" is, in contrast, precisely defined in the first section of Part D of title I of the CAA, 42 U.S C § 7501(2) Accordingly, the MCA's reference to "nonattainment areas within the meaning of part D of title I" should be read as specifying that provision

[7] Prior to *Bethlehem Steel*, EPA took the position that it could modify a designation at any time when warranted by evidence of nonattainment of NAAQS EPA relied upon section 171(2) of the CAA ("section 171"), 42 U S.C § 7501(2), which states that "[t]he term 'nonattainment area' includes any area identified under" section 107(d) According to EPA, "the verb 'include' suggests that EPA's redesignation authority covers not only areas for which the state has requested a nonattainment designation pursuant to CAA section 107(d), but also areas for which the state has not requested such a designation " 53 Fed Reg 20,724 (1988) EPA's position was supported by a prominent environmental law scholar, Professor David Currie David P. Currie, *Air Pollution: Federal Law and Analysis* § 6.04, at 6-12 (1981) (citing a subsequently superseded EPA regulation, 40 C.F R § 81.300, as providing that EPA can unilaterally initiate changes in designations, and stating that "it is up to the EPA to designate any (nonattainment areas) the states have not listed"). While the Seventh Circuit in *Bethlehem Steel* stated that "there is no indication that Congress intended section 171, a definitional provision, to nullify the time limits in section 107(d)," 723 F.2d at 1307, Professor Currie has ably pointed out that "[t]he difficulty with this argument is its assumption that the time limit in question was meant to restrict the EPA's obligation to apply the nonattainment provision to *all* nonattainment areas, which merely 'include' those listed pursuant to state proposals under Sec. 107(d)." Currie, *supra*, 1988 Cumulative Supplement Sec 6.04, at 78. We need not, and do not, answer this dispute over the proper interpretation of section 107(d). It is enough to note that the MCA can reasonably be interpreted to give EPA unilateral designation authority with respect to two specific NAAQS.

lems. *See, e.g., Ashwander v. TVA*, 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring); *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).

## B. EPA's Three Alternative Interpretations

We now examine EPA's three alternative interpretations in light of the preceding discussion of the MCA's last sentence. The first interpretation would merely require EPA to identify those areas that failed to obtain the NAAQS, without unilaterally attaching any regulatory consequences. This interpretation, which would allow EPA to notify the states of its findings that the area is one of nonattainment, comports with the understanding of section 107(d) expressed in *Bethlehem Steel*, under which the imposition of Part D obligations would occur only after the states had submitted lists to EPA and EPA had promulgated such lists.

Under the second and third interpretations, EPA would designate areas as nonattainment — designations that would impose Part D regulatory requirements[8]— without first receiving lists from the states. These interpretations are in harmony with the suggested interpretation of the MCA's last sentence discussed above. Accordingly, we are of the opinion that the second and third interpretations are defensible under the Supreme Court's *Chevron* standard, which calls for deference to an agency's "reasonable" interpretations of the statute it administers.[9]

## III. Conclusion

All three of EPA's alternative interpretations of the MCA's last sentence are "reasonable," within the meaning of the Supreme Court's holding in

---

[8] Under the second interpretation, Part D consequences would attach to all areas designated as nonattainment; under the third interpretation, Part D consequences would only attach to those areas that had not previously been designated as nonattainment. *See* text following note 2, *supra*

[9] OMB argues that EPA's second and third interpretations should be rejected, since they "would effectively repeal the Clean Air Act (CAA) provisions that reserve to the States the primary role for designating 'nonattainment areas,'" and therefore would violate the rule of statutory construction that repeals by implication are disfavored OMB Letter at 1 We reject OMB's premise, however, that the second and third interpretations necessarily would work an implied repeal of section 107(d). As previously discussed, the provisions of Part D of the CAA, section 171, at least as referenced by the MCA, may reasonably be read as giving EPA authority to designate areas that is *independent of and additional to* the section 107(d) process The second and third interpretations in no way preclude EPA from promulgating designations in response to lists submitted by the states; they merely suggest an alternative procedure for making designations with respect to two particular NAAQS, in addition to that procedure enumerated in section 107(d) We also find wanting OMB's argument that the second and third interpretations run afoul "of the repeated statements in the legislative history that the [Mitchell-Conte] Amendment simply 'freezes the status quo' until Congress can undertake a more comprehensive review of the Clean Air Act." OMB Letter at 2 As EPA correctly points out, however, all of the statements that refer to "freez[ing] the status quo ... concern a provision [set forth in the first part of the MCA] temporarily suspending EPA's authority to impose Clean Air Act sanctions in connection with nonattainment of the ozone or carbon monoxide NAAQS; none addresses [the last sentence of the MCA, which sets forth] the Mitchell-Conte Amendment's redesignation provision " EPA Letter, *supra* note 3, at 4. We fully agree with EPA's point that the references to "freez[ing] the status quo," which were not directed at the MCA's last sentence, do not bear on the interpretation of that sentence.

*Chevron.* Accordingly, since EPA is the agency which administers the CAA as amended by the MCA, we defer to EPA's judgment on which of its alternative interpretations to adopt.

DOUGLAS W. KMIEC
*Assistant Attorney General*
*Office of Legal Counsel*
