#26939 – #26944-aff in pt, rev in pt & rem-JKK
**2015 S.D. 22**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

(#26939)

| | |
|---|---|
| KERWIN EAGLEMAN and NOAH C. ONE STAR, | Plaintiffs, |
| and | |
| RALPH EAGLEMAN, LAWRENCE FORD, ANTOINETTE (ONE STAR) MILLER, | Plaintiffs and Appellants, |
| v. | |
| DIOCESE OF RAPID CITY, | Defendant, |
| WISCONSIN PROVINCE OF THE SOCIETY OF JESUS, DIOCESE OF RAPID CITY and ROSEBUD EDUCATIONAL SOCIETY/ST. FRANCIS MISSION, | Defendants and Appellees. |

--------------------------------------------------------------------------------------------------------------

(#26940)

| | |
|---|---|
| IDA MARSHALL, | Plaintiff and Appellant, |
| v. | |
| WISCONSIN PROVINCE OF THE SOCIETY OF JESUS and ROSEBUD EDUCATIONAL SOCIETY/ST. FRANCIS MISSION, | Defendants and Appellees. |

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE RODNEY J. STEELE
Retired Judge

\* \* \* \*

ARGUED OCTOBER 7, 2014
OPINION FILED **04/15/15**

--------------------------------------------------------------------------------
(#26941)

WENDELL D. BIG CROW, SR.,                    Plaintiff and Appellant,

      v.

WISCONSIN PROVINCE OF THE
SOCIETY OF JESUS and ROSEBUD
EDUCATIONAL SOCIETY/ST. FRANCIS
MISSION,                                     Defendants and Appellees.

--------------------------------------------------------------------------------
(#26942)

REGINA ONE STAR,                             Plaintiff and Appellant,

      v.

WISCONSIN PROVINCE OF THE
SOCIETY OF JESUS, BROTHER
PAUL A. FREY; BROTHER CHAPMAN; and
ROSEBUD EDUCATIONAL SOCIETY/
ST. FRANCIS MISSION,                         Defendants and Appellees.

--------------------------------------------------------------------------------
(#26943)

DAVID STANDING SOLDIER,                      Plaintiff and Appellant,

      v.

WISCONSIN PROVINCE OF THE
SOCIETY OF JESUS, FATHER
KEN WALLEMAN; and ROSEBUD
EDUCATIONAL SOCIETY/
ST. FRANCIS MISSION,                         Defendants and Appellees.

--------------------------------------------------------------------------------
(#26944)

D.M.,                                        Plaintiff,


A.L.; L.T.; H.D.G.,                          Plaintiffs and Appellants,

      v.

DIOCESE OF RAPID CITY,                       Defendant,

WISCONSIN PROVINCE OF THE
SOCIETY OF JESUS, DIOCESE OF
RAPID CITY; ROSEBUD EDUCATIONAL
SOCIETY/ST. FRANCIS MISSION;
SISTERS OF ST. FRANCIS, DENVER,
COLORADO; HOLY ROSARY MISSION;
BROTHER FRANCIS P. CHAPMAN,
SISTER MARIA GORETTI;
FATHER ALBERT JANKA;
FATHER BERNARD FAGAN,                           Defendants and Appellees.

* * * *

GREGORY A. YATES
MICHAEL SHUBECK of
Law Offices of Gregory A. Yates
Rapid City, South Dakota                        Attorneys for plaintiffs and
                                                appellants.

BARBARA ANDERSON LEWIS
THOMAS G. FRITZ of
Lynn, Jackson, Shultz & Lebrun, PC
Rapid City, South Dakota                        Attorneys for defendants and
                                                appellees Rosebud Education
                                                Society/St. Francis Mission.

TERRY L. PECHOTA
Rapid City, South Dakota                        Attorney for defendants and
                                                appellees Wisconsin Province of
                                                the Society of Jesus.

KONENKAMP, Retired Justice

[¶1.]     This appeal requires us to construe statutes of limitation affecting childhood sexual abuse claims against entities that allegedly failed to take steps to safeguard children from known or suspected molesters.  Plaintiffs allege that they were sexually abused sometime during the late 1950s through the early 1970s by certain priests, brothers, nuns, and others when they were children attending St. Francis Mission School on the Rosebud Indian Reservation.  The school was operated by the Wisconsin Province of the Society of Jesus and the Rosebud Educational Society/St. Francis Mission (the Societies).  In granting summary judgment for the Societies, the circuit court ruled that (1) plaintiffs' suits were barred by the 2010 amendment to SDCL 26-10-25 setting an age limit for claimants to bring suit; (2) plaintiffs failed to demonstrate a material issue of fact in dispute that the Societies committed intentional criminal conduct against plaintiffs; and (3) on their personal injury claims, plaintiffs failed to establish fraudulent concealment necessary to toll the three-year statute of limitations under SDCL 15-2-14(3).

## Background

[¶2.]     After our decisions in *Zephier v. Catholic Diocese of Sioux Falls*, 2008 S.D. 56, 752 N.W.2d 658, and *Bernie v. Blue Cloud Abbey*, 2012 S.D. 64, 821 N.W.2d 224, plaintiffs amended their complaints for a third time, adding that the statute of limitations was tolled under SDCL 26-10-25 because the Societies "perpetrated the actual act[s] of sexual abuse" by assisting, harboring, concealing, aiding, and abetting the abuse in violation of SDCL 22-22-46 and SDCL 22-3-3.  Plaintiffs also alleged that the statute of limitations under SDCL 15-2-14(3) was tolled because the

Societies fraudulently concealed the sexual misconduct, which prevented plaintiffs from discovering their personal injury causes of action against the Societies.

[¶3.]     The Societies jointly moved for summary judgment. Relying on this Court's decision in *Bernie*, the circuit court concluded that the Societies could not be linked to intentional conduct, and thus the tolling provisions of SDCL 26-10-25 did not apply. *See* 2012 S.D. 64, ¶ 17, 821 N.W.2d at 230. Further, the court held that the 2010 amendment to SDCL 26-10-25, barring the recovery of damages for childhood sexual abuse sought by those reaching age forty, was not unconstitutional and applied retroactively to plaintiffs' claims against the Societies. Lastly, the court ruled that plaintiffs failed to present a material issue of fact in dispute to support their claim that the Societies fraudulently concealed plaintiffs' causes of action.

[¶4.]     On appeal, plaintiffs contend that the circuit court erred in granting summary judgment because (1) if the Legislature intended HB 1104 (the 2010 amendment to SDCL 26-10-25) to apply to plaintiffs' pending litigation, it is unconstitutional; (2) the Societies engaged in intentional criminal acts as defined by SDCL 26-10-29; (3) the Societies failed to establish that plaintiffs discovered or should have discovered their causes of action against the Societies sooner than three years before filing suit under SDCL 26-10-25; and (4) the statute of limitations was tolled by the Societies' fraudulent concealment.[1]

---

1.    This is an appeal of six cases with the following ten plaintiffs: Ralph Eagleman, Lawrence Ford, Antoinette Miller, Adrian Larvie, Larry Tar, Howard Dean Graham, David Standing Soldier, Ida Marshall, Regina One Star, and Wendell D. Big Crow, Sr.

## Analysis and Decision

[¶5.] When we review a summary judgment, we resolve disputed facts in favor of the nonmoving party and decide whether the lower court properly granted judgment as a matter of law. *Bordeaux v. Shannon Cnty. Sch.*, 2005 S.D. 117, ¶ 11, 707 N.W.2d 123, 126. If the nonmoving party will bear the burden of proof at trial on a dispositive issue, that party must, "by . . . affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); SDCL 15-6-56(e). "[S]ummary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *One Star v. Sisters of St. Francis*, 2008 S.D. 55, ¶ 9, 752 N.W.2d 668, 674.

### 1. Constitutionality of 2010 Amendment to SDCL 26-10-25

[¶6.] In 2010, the Legislature amended SDCL 26-10-25 by adding an age limit to certain sexual abuse lawsuits: "However, no person who has reached the age of forty years may recover damages from any person or entity other than the person who perpetrated the actual act of sexual abuse." 2010 S.D. Sess. Laws ch. 141, § 1 (HB 1104). All plaintiffs were over age forty when they brought suit against the Societies. But plaintiffs maintain that the amendment is unconstitutional as applied to them. They contend that HB 1104 violates the Bill of Attainder Clause because our Legislature specifically targeted them when it enacted the amendment, did so in retaliation for plaintiffs' lawful exercise of their

rights, and deprived them of their previously enjoyed right to bring suit against the Societies. *See* U.S. Const. art. I, § 9, cl. 3; S.D. Const. art. VI, § 22.

[¶7.] The United States Supreme Court has defined a bill of attainder as "a legislative act which inflicts punishment without a judicial trial." *Cummings v. Missouri*, 71 U.S. 277, 323, 18 L. Ed. 356 (1866). Historically, a bill of attainder "was a device often resorted to in sixteenth, seventeenth and eighteenth century England" for condemning "to death one or more specific persons" who had purportedly "attempted, or threatened to attempt, to overthrow the government." *United States v. Brown*, 381 U.S. 437, 441, 85 S. Ct. 1707, 1711, 14 L. Ed. 2d 484 (1965). Identical to the bill of attainder was the "bill of pains and penalties," which "prescribed a penalty short of death[.]" *Id.* Once written into the Constitution, the Bill of Attainder Clause was used as "a general safeguard against legislative exercise of the judicial function, or more simply — trial by legislature." *Id.* at 442, 85 S. Ct. at 1711-12.

[¶8.] The Supreme Court rejected "a narrow historical reading (which would exclude bills of pains and penalties)" and instead interpreted the Clause "in light of the evil the Framers had sought to bar: legislative punishment, of any form or severity, of specifically designated persons or groups." *Id.* at 447, 85 S. Ct. at 1714. Thus, the "deprivation of any rights, civil or political, previously enjoyed," could constitute a bill of attainder depending on "the circumstances attending and the causes of the deprivation[.]" *Id.* (quoting *Cummings*, 71 U.S. at 320). Under the most current interpretations, "a law is prohibited if it (1) applies with specificity, and (2) imposes punishment." *BellSouth Corp. v. F.C.C.*, 162 F.3d 678, 683 (D.C.

-4-

Cir. 1998); *see Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 850-51, 104 S. Ct. 3348, 3354, 82 L. Ed. 2d 632 (1984); *Foretich v. United States*, 351 F.3d 1198, 1217 (D.C. Cir. 2003); *WMX Techs., Inc. v. Gasconade Cnty.*, 105 F.3d 1195, 1202 (8th Cir. 1997). Specificity is established when an enactment singles out individuals or easily ascertainable members of a group. *See Foretich*, 351 F.3d at 1217.

[¶9.] Here, HB 1104 neither named plaintiffs nor singled them out. This law applies against all persons over forty years of age seeking to bring suit against nonperpetrators of child sexual abuse. It legislates with respect to certain characteristics (over forty, suits against nonperpetrators) and not with respect to a certain group. *See, e.g.*, *Brown*, 381 U.S. at 455, 85 S. Ct. at 1718. Even if we assume that plaintiffs meet the specificity element, that alone will not render a law unconstitutional as a bill of attainder. "[A] law may be so specific as to create a 'legitimate class of one' without amounting to a bill of attainder unless it also satisfies the 'punishment' element of the analysis." *Foretich*, 351 F.3d at 1217 (quoting *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 472, 97 S. Ct. 2777, 2805, 53 L. Ed. 2d 867 (1977)). The punishment inquiry implicates a three-part test: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Id.* at 1218 (quoting *Selective Serv. Sys.*, 468 U.S. at 852, 104 S. Ct. at 3355).

[¶10.] HB 1104 does not fall within the historical meaning of legislative punishment because, in addition to not imposing death or pains and penalties, the law does not "mark specified persons with a brand of infamy or disloyalty." *See id.* at 1220. The enactment does not bar any and all redress for victims over forty years old, but only limits sexual abuse claims against nonperpetrators. Moreover, HB 1104 can reasonably be said to further a nonpunitive legislative purpose because, by abolishing a plaintiff's right to recover damages from a nonperpetrator for childhood sexual abuse after a plaintiff reaches age forty, the Legislature acted to prevent stale claims.

[¶11.] On the final inquiry, "'whether the legislative record evinces [an] intent to punish[,]'" we examine "legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." *Id.* (quoting *Nixon*, 433 U.S. at 478, 97 S. Ct. at 2808). There must be "unmistakable evidence of punitive intent[.]" *Flemming v. Nestor*, 363 U.S. 603, 619, 80 S. Ct. 1367, 1377, 4 L. Ed. 2d 1435 (1960); *see Selective Serv. Sys.*, 468 U.S. at 855 n.15, 104 S. Ct. at 3357 n.15. Isolated statements are insufficient proof of punitive intent. *Foretich*, 351 F.3d at 1225 (quoting *BellSouth Corp.*, 162 F.3d at 690). Likewise, the motivation of a few representatives cannot be attributed to the Legislature as a whole. *See Palmer v. Clarke*, 408 F.3d 423, 434 (8th Cir. 2005).

[¶12.] From our review of the legislative history, the timing and context of the legislation, and the text and structure of the amendment, we see no unmistakable evidence of punitive intent. Although plaintiffs cite testimony from the hearings on HB 1104, those statements are isolated and cannot be said to be the

view of the Legislature as a whole. Moreover, the majority of the statements cited by plaintiffs are not from legislators, but from an attorney proposing the Bill. "The judicial function is 'not to destroy the Act if we can, but to construe it, if consistent with the will of Congress, so as to comport with constitutional limitations[.]'" *See Selective Serv. Sys.*, 468 U.S. at 850, 104 S. Ct. at 3354 (quoting *CSC v. Nat'l Ass'n of Letter Carriers*, 413 U.S. 548, 571, 93 S. Ct. 2880, 2893, 37 L. Ed. 2d 796 (1973)). HB 1104 is not a bill of attainder.

[¶13.]    Plaintiffs next contend that because HB 1104 is a statute of repose, the Legislature was constitutionally required to provide a grace period for the filing of claims. They further assert that under SDCL 2-14-24 it would be unconstitutional to apply HB 1104 to bar their claims against the Societies because plaintiffs commenced their lawsuits before the effective date of the amendment. That statute provides: "[n]o action or proceeding, civil or criminal, commenced before the code of laws enacted by § 2-16-13 took effect and no right accrued are affected by its provisions, but the proceedings thereunder must conform to the requirements of such code as far as applicable." *Id.*

[¶14.]    This Court has not before addressed the constitutionality of a statute of repose applied against a plaintiff whose suit was brought before the statute went into effect and when the Legislature did not clearly express its intent that the law operate against pending litigation. We have, however, declined to apply an amended statute to a pending case when the amendment revised the time limitation for actions under a contract but did not go into effect until after the action was commenced. *See Sheehan v. United Pac. Ins. Co.* (*Sheehan II*), 439

-7-

N.W.2d 117, 118 (S.D. 1989). We declined to give the statute retroactive effect because the Legislature did not clearly express its intent and because, "'under SDCL 2-14-24, no civil action commenced before the present code of laws took effect is affected by its provisions.'" *Id.* (quoting *First Nat'l Bank of Minneapolis v. Kehn Ranch, Inc.*, 394 N.W.2d 709, 716 (S.D. 1986)) (emphasis omitted).

[¶15.]     The Societies respond that because we previously ruled that the extended limitations period in SDCL 26-10-25 applied retroactively to perpetrators of child sexual abuse, the 2010 amendment barring persons age forty or older from pursuing their claims should apply retroactively as well. *See Stratmeyer v. Stratmeyer*, 1997 S.D. 97, ¶ 21, 567 N.W.2d 220, 224. It is true that this Court has held more than once that "statutes [affecting] remedy or procedure as opposed to those affecting substantive rights are given retroactive effect." *Lyons v. Lederle Labs.*, 440 N.W.2d 769, 770 (S.D. 1989) (citing *Brookings Cnty. v. Sayre*, 53 S.D. 350, 354, 220 N.W. 918, 920 (1928)); *see also Simpson v. Tobin*, 367 N.W.2d 757, 765 (S.D. 1985). "Statutes of limitation are remedial[.]" *Lyons*, 440 N.W.2d at 770. Yet we have never held that a newly enacted limitations period applies retroactively to a pending lawsuit.

[¶16.]     Our Legislature did not express an intent that HB 1104 apply to pending litigation; thus, like our decision in *Sheehan II*, we think it unsound to apply HB 1104 to abruptly terminate plaintiffs' pending suits against the Societies. *See Phillips v. Johnson*, 599 N.E.2d 4, 8 (Ill. App. Ct. 1992); *see also Brown v. Angelone*, 150 F.3d 370, 374 (4th Cir. 1998); *Boggs v. Adams*, 45 F.3d 1056, 1062-63 (7th Cir. 1995); *Groch v. Gen. Motors Corp.*, 883 N.E.2d 377, 409-10 (Ohio 2008).

Plaintiffs commenced these actions before HB 1104 went into effect and "basic concepts of justice, fairness and equity militate . . . against retroactive application" of the amendment to these cases. *See Phillips*, 599 N.E.2d at 8. We must therefore determine, under SDCL 26-10-25, whether the record supports any genuine issue of material fact showing that the Societies committed intentional criminal acts against plaintiffs.

**2. Intentional Criminal Conduct under SDCL 26-10-25**

[¶17.] In *Bernie*, we concluded that "SDCL 26-10-25 extended the time to commence *certain* actions involving childhood sexual abuse." 2012 S.D. 64, ¶ 3, 821 N.W.2d at 226 (emphasis added). "Childhood sexual abuse" is defined in SDCL 26-10-29 as "any act committed by the defendant against the complainant who was less than eighteen years of age at the time of the act and which act would have been a violation of chapter 22-22 or prior laws of similar effect at the time the act was committed which act would have constituted a felony." *See also Bernie*, 2012 S.D. 64, ¶ 12, 821 N.W.2d at 229; *Stratmeyer*, 1997 S.D. 97, ¶ 15, 567 N.W.2d at 223. Plaintiffs contend there is a genuine issue of material fact on whether the Societies caused and knowingly permitted minors to be abused, and assisted, harbored, concealed, and provided false information about sex offenders. *See* SDCL 22-22-24.3 (sexual exploitation of a minor); SDCL 22-22-46. Because neither SDCL 22-22-24.3 nor SDCL 22-22-46 were in effect when plaintiffs claim they were sexually abused (from the late 1950s to the early 1970s), they direct us to "prior laws of similar effect at the time" the acts were committed: SDC 1939, 13.0203 (aiding and abetting), SDC 1939, 13.2801 (statutory rape), SDC 1939, 13.2803 (rape), SDC

Supp. 1960, 13.1727 (indecent molestation of a minor), SDCL 22-22-5 (1972) (rape). *See* SDCL 26-10-29.

[¶18.]     As evidence that the Societies perpetrated intentional criminal conduct, plaintiffs quote certain letters and documents. These materials, plaintiffs contend, demonstrate that the Societies had knowledge of "widespread and long lasting abuse" constituting criminal conduct, and the Societies intentionally assisted, harbored, and concealed the perpetrators. In a letter from July 1968, the Consultor of the House at St. Francis reported Brother Francis Chapman's problem with "drinking to excess" and "fooling around with little girls — he had them down in the basement of our building in the dark where we found a pair of panties torn, and then giving out food, smokes, etc. excessively at the back door." The letter went on, "[W]hat I am concerned about is whether he is mentally sick — the girl situation is known in the sense that he is around little girls very much[.]" The Consultor spoke to Brother Chapman on this subject: "I had a nice talk with him on these points and he took it all nicely."

[¶19.]     Another letter from St. Francis in October 1968 repeated concerns about Brother Chapman: "Harry talked with him about the little girls and handouts again." Then, in January 1970, the Consultor reported that Brother Chapman "has made a remarkable comeback. He is a new man. His work is excellent, most helpful, and he has displayed a wonderful spirit of charity. I can only say that he is a new man in every way. He deserves a great deal of credit for being humble and changing as he has done." In July of that same year, similar accounts about Brother Chapman reported: "He is most cheerful, cooperative, pleasant, helpful — I

can hardly know of anyone who has changed so much for the good in such a short time. He is to be commended. All the points that he was warned about have been observed."

[¶20.] Yet, in January 1971, Brother Chapman's superior wrote, "There was one incident involving Brother Chapman similar to those of the past which brought into question the prudence of his remaining here at St. Francis. But in view of the fact of his generally improved spirit and his notable contribution to community life, the decision was made to counsel with him rather strongly in the hope that future incidents would be avoided." Still, similar concerns were again expressed in February 1973 — Brother Chapman does have "some difficulty with little girls[.]" Plaintiffs Ida Marshall, Antoinette Miller, and Adrian Larvie recount repeated abuse by Brother Chapman.

[¶21.] Plaintiffs also point to correspondence between Father Bernard D. Fagan and his superiors. On October 11, 1984, referring to a recent meeting they had, Father Patrick J. Burns, the Jesuit Order Provincial for the Wisconsin Province in Milwaukee, wrote to Father Fagan about treatment for "sexual addictions." Father Fagan was warned that he "must be open to doing something more than you are presently doing to break your pattern." As the Provincial, Father Burns saw it as his responsibility "to do whatever I in the end judge necessary to put an absolute halt to the inappropriate behavior which we all realize gravely endangers the good name of the Society and the Catholic Church and could at any time put an end to your ministry as a Jesuit and as an active Catholic priest." Father Fagan responded: "Especially jolting was the thought of possible

-11-

dismissal from the Society and suspension from the active priesthood. Such a consequence is the farthest thing from my whole life's hope and desire." He informed Father Burns that he was "seeing a behavioral modification therapist at Yankton." He added, "[I]t has become apparent both to [the therapist] and to me that your letter seems to have been a significant factor in 'breaking the pattern.'"

[¶22.]    In a 1994 letter to the Vicar General of the Diocese of Rapid City, Father Fagan summarized his past sexual misconduct. He wrote that while he was the director of the St. Francis Mission in the late 1970s, he engaged in "sexual activity with Native American girls." He reported that the sexual activity occurred approximately eighteen times between 1977 and 1980, with approximately "twelve girls" in "unrelated events." These "girls," in Father Fagan's description, were all "of the type who had a reputation for drinking and promiscuity." He claimed that he was "very open in discussing [his] sexual problems with [his] superior, spiritual director, and provincial." After he took a sabbatical in 1980–81, he was stationed at Isaac Jogues Church in Rapid City, where he said, "The same pattern continued involving Native American girls I would pick up along the streets." He also reported that he "was very much aware of the danger of scandal which would occur if the situation became public," and to his knowledge it never did become public. He was sent for treatment to the House of Affirmation and resided there from November 1982 until March 1983. Afterwards, "a couple of relapses with Indian girls who [he] picked up along the streets in the Winner area" prompted his superiors to require him to seek treatment with a behavioral psychologist. He reported that no sexual acting out occurred after 1983. One plaintiff, Larry Tar,

alleged that Father Fagan fondled him from 1968–1971. Nothing in these letters or in any other evidence produced here suggests that the Societies knew of Father Fagan's misconduct, if any there was, during the time Larry Tar alleged he was molested. Moreover, aside from his reference to "girls," there was no indication that Father Fagan was molesting children or students at St. Francis Mission.

[¶23.] On summary judgment we must view the evidence most favorably to plaintiffs, but conclusory and speculative assertions are insufficient: plaintiffs must present specific facts showing that a genuine issue exists for trial. *See U.S. Bank Nat'l Ass'n v. Scott*, 2003 S.D. 149, ¶ 39, 673 N.W.2d 646, 657. There is no evidence in the record that the Societies engaged in intentional criminal conduct against these plaintiffs, which occurred when plaintiffs were less than eighteen years old, and which constituted childhood sexual abuse. *See* SDCL 26-10-25; SDCL 26-10-29. Even assuming that Father Fagan's 1994 admissions referred to sexual relations with St. Francis Mission School students — the "Native American girls" are not further identified — those revelations were given long after the events alleged in these lawsuits and cannot prove the Societies' knowledge or participation during the times plaintiffs allege.

[¶24.] As for Brother Chapman, on the other hand, the letters are evidence that the Societies knew of his proclivities, but plaintiffs direct us to no law in effect between 1950 and 1980 making it equivalent to childhood sexual abuse or a felony for the Societies to fail to report suspected child abuse. Moreover, the letters do not show that the Societies participated in any perpetrator's misconduct or that the Societies acted with any criminal intent. *See State v. Jucht*, 2012 S.D. 66, ¶ 27, 821

N.W.2d 629, 635-36. No genuine issue of material fact supports the allegation that the Societies aided and abetted Brother Chapman's abuse: statutory rape, *see* SDC 1939, 13.2801, or indecent molestation of a minor, *see* SDC 1960, 13.1727. Intentional criminal conduct does "'not include negligently allowing an offense to happen or placing a perpetrator in a position to commit a sexual offense against a child.'" *See Bernie*, 2012 S.D. 64, ¶ 8, 821 N.W.2d at 227 (quoting *Sandoval v. Archdiocese of Denver*, 8 P.3d 598, 602 (Colo. App. 2000)). Because there is no genuine issue of material fact showing that the Societies committed intentional criminal acts against plaintiffs as defined by SDCL 26-10-29, the circuit court correctly ruled that SDCL 26-10-25 does not apply.

### 3. Discovery of Abuse Before Expiration of Statute of Limitations

[¶25.]     Because SDCL 26-10-25 is inapplicable here, we need not address plaintiffs' third issue — whether the Societies established that plaintiffs discovered or should have discovered that their injuries or conditions were caused by the alleged acts of abuse sooner than three years before filing suit under SDCL 26-10-25.

### 4. Tolling of Statute of Limitations for Fraudulent Concealment

[¶26.]     With liability under SDCL 26-10-25 not established, plaintiffs' personal injury claims are governed by SDCL 15-2-14(3), which provides that a suit for personal injury must be commenced "within three years after the cause of action shall have accrued[.]" Because plaintiffs were minors, accrual extended one year after they reached the age of majority. SDCL 15-2-22. The latest date any plaintiff

reached the age of 19 was in 1977. Unlike SDCL 26-10-25, no statutory discovery rule applies to SDCL 15-2-14(3). *Koenig v. Lambert*, 527 N.W.2d 903, 905 (S.D. 1995), *overruled on other grounds by Stratmeyer*, 1997 S.D. 97, 567 N.W.2d 220; *Baye v. Diocese of Rapid City*, 630 F.3d 757, 760 (8th Cir. 2011).

[¶27.]        All the abuses plaintiffs allege happened decades ago. Brother Chapman, the subject of several accusations, cannot respond. He died in 1990. Neither can Father Fagan, another accused perpetrator. He died in 1997. Statutes of limitation are vital to the timely resolution of disputes and the stability of human affairs. In setting arbitrary boundaries, these statutes balance protection of valid claims against preclusion of stale ones. In the words of Justice Holmes, statutes of limitation "are designed to promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554, 94 S. Ct. 756, 766, 38 L. Ed. 2d 713 (1974) (quoting *Order of R.R. Telegraphers v. Ry. Express Agency*, 321 U.S. 342, 348-49, 64 S. Ct. 582, 586, 88 L. Ed. 788 (1944)) (internal quotation mark omitted). Not being mere technicalities, statutes of limitation require strict compliance. *Dakota Truck Underwriters v. S.D. Subsequent Injury Fund*, 2004 S.D. 120, ¶ 17, 689 N.W.2d 196, 201. "[A] defense based on a statute of limitations is meritorious and should not be regarded with disfavor." *Chipperfield v. Woessner*, 84 S.D. 13, 16, 166 N.W.2d 727, 728 (1969), *quoted in Burke v. Foss*, 334 N.W.2d 861, 864 (S.D. 1983). In accord with SDCL 15-2-14(3), the time to bring these suits has long expired. Unless each

plaintiff establishes an exception to the statute of limitations, each claim is barred on its face.

[¶28.]      Plaintiffs contend that the doctrine of fraudulent concealment, a common law rule grafted onto the statute of limitations, applies to delay the limitations period.  Fraudulent concealment tolls the statute of limitations until the claim is discovered or might have been discovered with reasonable diligence.  *Strassburg v. Citizens State Bank*, 1998 S.D. 72, ¶ 14, 581 N.W.2d 510, 515.  Plaintiffs bear the burden in summary judgment proceedings to establish the existence of material facts substantiating fraudulent concealment.  *Koenig*, 527 N.W.2d at 905.  This doctrine is intended to ensure that defendants cannot take advantage of their own wrongs by concealing them to permit the limitations period to expire.

[¶29.]      For a statute of limitations to be tolled for fraudulent concealment, plaintiffs must prove three elements: (1) the Societies knowingly concealed material facts that constitute plaintiffs' causes of action or, being fiduciaries, knowingly remained silent and failed to disclose those facts despite a duty to do so; (2) plaintiffs exercised due diligence in attempting to discover their causes of action; and (3) despite plaintiffs' due diligence, the Societies' concealment prevented plaintiffs from discovering their causes of action.  *See One Star*, 2008 S.D. 55, ¶¶ 32-34, 752 N.W.2d at 681-82; *Hinkle v. Hargens*, 76 S.D. 520, 524-25, 81 N.W.2d 888, 891 (1957); *see also Doe v. Catholic Bishop for the Diocese of Memphis*, 306 S.W.3d 712, 719 (Tenn. Ct. App. 2008).  Among the allegations here, plaintiffs aver that the Societies:

> did suppress and conceal the true facts, and continue to do so, with the intent to prevent plaintiffs and others from learning that Brother Chapman, Father Paul Fray, Coach Daniel Fullerton, Father Joseph Gill, Father Kowalski, and Father Bob had been and were continuing to molest minors; . . . to prevent further reports and outside investigations into misconduct by [these individuals and the Societies]; . . . [and] to prevent discovery of [the Societies'] own fraudulent conduct[.]

With these assertions in mind, we examine, in two groups, the three criteria necessary to establish fraudulent concealment.

### Group A Plaintiffs

[¶30.] Group A comprises those plaintiffs alleging sexual abuse by perpetrators other than Brother Chapman. They are Ralph Eagleman, Lawrence Ford, Larry Tar, Howard Dean Graham, David Standing Soldier, Regina One Star, and Wendell D. Big Crow, Sr.[2] These plaintiffs contend that they cannot be held to have discovered their injuries, when, through the trauma of sexual abuse, they repressed those memories or failed to appreciate the injuries the abuse caused. In its memorandum decision, the circuit court concluded that "[i]n these cases it is evident from the pleadings, depositions, and affidavits that the plaintiffs were aware of the alleged abuses and the fact that the abusers were clergy of the Catholic Church from the time the alleged abuses took place. None are cases of repressed memory[.]" Disputing this, plaintiffs contend that the court failed to address "uncontested evidence in the affidavits of Howard Graham and Adrian Larvie that

---

2.  Larry Tar submitted no affidavit or deposition testimony in response to the Societies' motion for summary judgment. Therefore, he has failed to offer material facts to raise a genuine, triable controversy on his burden to show why fraudulent concealment should toll the statute of limitations.

they only recently recalled the memories . . . [and failed to] address evidence of repression by Lawrence Ford, Antoinette Miller, Ralph Eagleman, Regina One Star and David Standing Soldier."[3]

[¶31.] It appears the circuit court overlooked this material, though only some of the plaintiffs claimed to have recently recovered all their memories before bringing suit. Certain plaintiffs avoided the memories because, according to their appellate brief, they did so out of "self-blame" and "shame." Others remembered the abuse, but only shortly before suit did they began to connect their injuries to the abuse they suffered. Plaintiffs' expert, Dr. King, attested that some plaintiffs avoided or repressed their memories as a psychological coping mechanism and others only recently connected the abuse to their injuries.

[¶32.] In any event, the circuit court also concluded that there was "no evidence in these cases that the [Societies] concealed anything from the plaintiffs which would have prevented them from timely pursuing their claims." On this point of law, Judge Posner, writing in *Cada v. Baxter Healthcare Corp.*, explained that fraudulent concealment "denotes efforts by the defendant — above and beyond the wrongdoing upon which the plaintiff's claim is founded — to prevent the plaintiff from suing in time." 920 F.2d 446, 451 (7th Cir. 1990). Accordingly, plaintiffs must prove the Societies committed fraudulent concealment "above and

---

3. Howard Dean Graham did not file a signed, sworn affidavit or any deposition testimony. The record contains only an unsigned, undated document labelled as his affidavit. For summary judgment purposes, an unsigned and unsworn affidavit is a nullity. *Pension Benefit Guar. Corp. v. Heppenstall Co.*, 633 F.2d 293, 300 (3d Cir. 1980).

beyond the [alleged torts] upon which [their] claim[s are] founded . . . to prevent [plaintiffs] from suing in time." *See id.*

[¶33.] In answer to this question, plaintiffs assert that the Societies remained silent in the face of a fiduciary duty to disclose.[4] No ongoing relationship of trust and confidence between the Societies and plaintiffs existed after the plaintiffs left school. *Cf. Koenig*, 527 N.W.2d at 904 (abusive relationship lasted seventeen years from the time the parishioner victim was twelve until he was twenty-nine). In the absence of any other evidence to the contrary, a fiduciary relationship between plaintiffs and the Societies ended when plaintiffs left school and became adults. *See Zumpano v. Quinn*, 849 N.E.2d 926, 930-31 (N.Y. 2006). Thus, any breach of fiduciary duty had to have arisen during the time plaintiffs were minor students at St. Francis.[5]

[¶34.] Other than faulting the Societies for failing to inform them of past abuse, plaintiffs offer no evidence that the Societies' actions, inactions, or silence fraudulently led them to forego or delay their claims or led them to believe they had

---

4. This case invokes two fiduciary concepts: first, as part of plaintiffs' claim that the Societies breached fiduciary duties as a substantive basis of liability for damages; and second, the issue we are dealing with here, as a determiner in tolling the statute of limitations for fraudulent concealment.

5. Plaintiffs allege that the Societies' fraudulent concealment continues to the present, suggesting an indefinite duty to disclose whenever the Societies may acquire knowledge of abuse. But, as we noted in *One Star*, if plaintiffs' approach "were to prevail, then any time a tortfeasor failed to disclose evidence that would demonstrate its liability in tort, the statute of limitations would be tolled under the doctrine of concealment. . . . [T]his is not the law." 2008 S.D. 55, ¶ 35, 752 N.W.2d at 682-83 (quoting *Mark K. v. Roman Catholic Archbishop of Los Angeles*, 79 Cal. Rptr. 2d 73 (Cal. Ct. App. 1998)).

no claims. In fact, plaintiffs do not attest that the Societies' "silence misled [them] into believing that the alleged sexual abuse did not occur" or "that it had not been committed by" the named brothers, priests, and others.[6] *See Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 879 A.2d 270, 279 (Pa. Super. Ct. 2005) (finding no tolling for fraudulent concealment); *Doe v. Roman Catholic Archbishop of Archdiocese of Detroit*, 692 N.W.2d 398, 407-08 (Mich. Ct. App. 2004). Nor have plaintiffs offered evidence that the Societies knew of plaintiffs' claimed injuries, much less concealed them. *See Baselice*, 879 A.2d at 279. Plaintiffs offered no evidence that "they were lied to by the [Societies] with regard to the identity of their abusers or their abusers' place within the [Societies], which if relied upon, would have caused them to suspend pursuit of their claims." *See Meehan v. Archdiocese of*

---

6.    One possible exception is David Standing Soldier. He testified that he told a nun about Father Gill's abuse. She called him a liar, he said, and sent him to Father Gill to be paddled. He also told Father Walleman, who took no action. Even if this can be characterized as misrepresentation, Standing Soldier never forgot the sexual abuse he suffered at the hands of Father Gill; nor did he lack knowledge or appreciation that what he alleged Father Gill did to him was abusive. When he was in alcohol treatment in 1986, his counselor wanted him to talk with a Catholic priest, as one of the steps toward recovery, about why he (Standing Soldier) drank excessively, one reason being the sexual and physical abuse, but Standing Soldier refused out of anger and distrust. Thus, under our holding in *One Star*, Standing Soldier possessed in 1986 some knowledge of a causal connection between his problems and the sexual abuse. That knowledge put him on inquiry notice to seek information about the problem and its cause. *See One Star*, 2008 S.D. 55, ¶ 20, 752 N.W.2d at 677. Once on inquiry notice, plaintiffs must seek out the truth; they cannot wait for the truth to seek them. *Mark K.*, 79 Cal. Rptr. 2d at 77. Fraudulent concealment will not apply in these circumstances because Standing Soldier had sufficient facts to bring a timely cause of action within three years of 1986. Even if initial misrepresentations constituted fraudulent concealment, such representations will not override a victim's subsequent knowledge. *Strassburg*, 1998 S.D. 72, ¶ 15, 581 N.W.2d at 516. *E.W. v. D.C.H.*, 754 P.2d 817, 821 (Mont. 1988).

*Philadelphia*, 870 A.2d 912, 922 (Pa. Super. Ct. 2005). Neither have the plaintiffs offered evidence that the Societies mischaracterized the alleged abuse as something other than what it was. *See, e.g.*, *Koenig*, 527 N.W.2d at 904 (abusing priest initially used pretense of needing to observe child victim "in the act of his confessed sin of masturbation"); *see also Doe v. Shults-Lewis Child & Family Servs., Inc.*, 718 N.E.2d 738, 743 (Ind. 1999) (child victim assured by superior that molester was "just trying to be friendly"); *Harkness v. Fitzgerald*, 701 A.2d 370, 372 (Me. 1997) (abuse misrepresented as punishment).

[¶35.]     Lastly, and perhaps most crucially, just as plaintiffs have produced no evidence that the Societies concealed something from them, so too they have not shown that the Societies had actual knowledge of the sexual abuse plaintiffs allege. *Ashdown v. Ameron Int'l Corp.*, 100 Cal. Rptr. 2d 20 (Cal. Ct. App. 2000) (claim of fraudulent concealment fails if defendant had no knowledge of facts); *Catholic Bishop for Diocese of Memphis*, 306 S.W.3d at 719 (essential element: defendant must be aware of the wrong). In *Koenig*, by contrast, there was a letter to the Bishop from the perpetrator priest about "pretty serious" accusations against him by a fellow priest; other priests and the Bishop were present at parties when the perpetrator "would become drunk and openly affectionate" with the minor victim; and "over a period of seventeen years, . . . seventeen different priests heard confession of the various incidents between" the perpetrator and the victim.[7] 527 N.W.2d at 906. Here, the Societies had to have had actual, not imputed, awareness

---

7.     The *Koenig* Court did not address the seal of confession or the priest-penitent privilege. *Cf. Parents of Minor Child v. Charlet*, 135 So. 3d 1177 (La. 2014).

of the facts necessary to establish plaintiffs' causes of action.[8] *Martinelli v.*

*Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 419-20 (2d Cir. 1999).

[¶36.]	Group A plaintiffs have produced no evidence that the Societies knew, at or near the time the alleged events occurred, information that they then fraudulently concealed by act or silence concerning Brother Paul Frey, Coach Daniel Fullerton, Brother Boschert, Father Joseph Gill, Father Kowalski, Father Bob, Father Ken Walleman, Father Bernard Fagan, and the other individuals plaintiffs name in their depositions and pleadings. The 1984 correspondence between Father

---

8.	We take this opportunity to clarify the knowledge requirement on the part of fiduciaries in fraudulent concealment cases. South Dakota originally adopted fraudulent concealment as an implied exception to our statutes of limitation in *Hinkle*, 76 S.D. at 525, 81 N.W.2d at 891. In that case, using Iowa law as a model, our Court wrote: "Where . . . a trust or other confidential relationship does exist between the parties, silence on the part of one having the duty to disclose, constitutes fraudulent concealment in the absence of any affirmative act." *Id.* In later cases, however, language was appended to this formulation, to wit: fiduciaries have a duty to disclose what they "knew or *should have known.*" *Holy Cross Parish v. Huether*, 308 N.W.2d 575, 577 (S.D. 1981) (emphasis added). *Holy Cross* cited a South Dakota United States District Court decision for this added language. *Canton Lutheran Church v. Sovik, Mathre, Sathrum & Quanbeck*, 507 F. Supp. 873, 878 (D.S.D. 1981). But the district court in *Canton* gave no explanation and cited no authority, other than *Hinkle*, for the "should have known" phrase. *See id.* Indiana appears to be the only jurisdiction to recognize "constructive" fraudulent concealment. *See Hughes v. Glaese*, 659 N.E.2d 516, 519 (Ind. 1995) (medical malpractice); *Palmer v. Gorecki*, 844 N.E.2d 149, 155 (Ind. Ct. App. 2006) (medical malpractice); *Spoljaric v. Pangan*, 466 N.E.2d 37, 42 (Ind. Ct. App. 1984) (medical malpractice). *But see Klippel v. Watkins*, 667 S.W.2d 28 (Mo. Ct. App. 1984) (physicians must have actual knowledge that injury was caused by malpractice). Commonly, the words "should have known" are used in negligence and due diligence contexts, but fraudulent concealment is a species of fraud, and to commit fraud one must be aware of the wrong being concealed. *Liebergesell v. Evans*, 613 P.2d 1170, 1177 (Wash. 1980) (fraudulent concealment a species of fraud). As with most other courts, we think the better rule applicable to nonperpetrator entities requires proof of actual knowledge on the part of those entities.

Fagan and the Provincial in Milwaukee and Father Fagan's 1994 summary of his sexual misconduct concerned events from 1977 to 1983. None of the plaintiffs allege any abuse against them in those years. And no evidence has been raised to show that the Societies knew of Father Fagan's transgressions, if any there were, during the years alleged by Larry Tar, the only plaintiff who claims that Father Fagan abused him. As for Brother Frey, plaintiffs insinuate the existence of knowledge because his "mental condition" and "drinking" were known to the Societies, but there is no evidence of any knowledge of sexual abuse.

[¶37.] Accordingly, Group A plaintiffs alleging fraudulent concealment have failed in their affirmative burden to specify material facts creating a genuine, triable controversy on the question whether the Societies knowingly concealed material facts that constitute plaintiffs' causes of action or, being fiduciaries, knowingly remained silent and failed to disclose those facts despite a duty to do so. Because there is no material issue of fact in dispute on whether the Societies fraudulently concealed Group A plaintiffs' causes of action, the circuit court ruled correctly that their suits against the Societies were statutorily barred as untimely under SDCL 15-2-14(3).

### Group B Plaintiffs

[¶38.] We are left with the Group B plaintiffs: Ida Marshall, Antoinette Miller, and Adrian Larvie.[9] Viewing the evidence in a light most favorable to these

---

9. In their appellate briefs, plaintiffs continue to cite Marian Sorace's and Lloyd One Star's abuse claims against Brother Chapman. Their cases are not before us. *See One Star*, 2008 S.D. 55, 752 N.W.2d 668.

plaintiffs — as we are required to do — over a period of five years, the Societies had actual knowledge of Brother Chapman's sexual misconduct with female students. His superiors knew in 1968 that he had been "fooling around with little girls" while "in the dark where [they] found a pair of panties torn[.]" They knew three years later when the same concerns arose, "which brought into question the prudence of his remaining here at St. Francis." And they knew two years hence in 1973, when they learned again he was having "some difficulty with little girls." Yet Brother Chapman stayed on at St. Francis the remainder of his life.

[¶39.]     This is relevant, of course, to plaintiffs' causes of action for negligence and breach of fiduciary duty. But it also raises a question of fraudulent concealment. We think there is a genuine issue of material fact on whether the Societies fraudulently concealed their knowledge of Brother Chapman's molestations by not disclosing and warning the students or their parents when these deviant acts were occurring. A similar fact pattern can be seen in *Martinelli*, 196 F.3d at 426. In that case, because the Bridgeport Diocese learned that a priest "had sexually molested boys, at least one of them unidentified, it owed the boys within the scope of its fiduciary obligations, including [the plaintiff], a duty to investigate and to warn possible past and future victims of the harm" from this priest. *Id.*

[¶40.]     Here, for summary judgment purposes, the first element of fraudulent concealment has been established: concealment by failing to disclose facts despite a fiduciary duty to do so. Two more elements must be proved in the fraudulent concealment analysis. Group B plaintiffs have the burden of showing that the

claimed fraudulent concealment prevented them from discovering their causes of action and that they exercised due diligence to discover those causes of action. *Hinkle*, 76 S.D. at 524, 81 N.W.2d at 891. We examine each of their claims to determine whether a genuine issue of material fact exists on these questions.

[¶41.] **Adrian Larvie.** In a signed affidavit dated September 18, 2013, Larvie attested that he "attended St. Francis Mission between ages 5 and 8 and during or about the years 1962 to 1967." He recounted sexual abuse at the hands of Brother Chapman and Sister Maria Goretti. He initiated suit in July 2010. With respect to his recollection, he said, "Recently, within the last few years, the memories of the abuse slowly started to surface. It wasn't until around 2008 that I finally made the connection between the sexual, physical and emotional abuse I had endured as a child and how that abuse has affected my whole life." This is insufficient. Without supporting facts and details, Larvie offered only conclusory language to establish due diligence in discovering his causes of action. *See Zephier*, 2008 S.D. 56, ¶ 3 n.2, 752 N.W.2d at 661 n.2; *One Star*, 2008 S.D. 55, ¶ 23, 752 N.W.2d at 678. He cannot disburden himself of the due diligence requirement merely by broadly proclaiming that his memories just recently surfaced. *See id.* Moreover, unlike most of the other plaintiffs, no expert opinion corroborated Larvie's claim that he recently recovered his memories and recently made the connection between abuse and injury. Even granting fraudulent concealment on the part of the Societies — a tenuous assumption since the Societies had no knowledge of any Brother Chapman misconduct with little boys — Larvie has not met his burden of showing that the concealment prevented him from discovering his

causes of action and that he exercised due diligence in attempting to discover those causes of action. Summary judgment was properly granted in Larvie's case.

[¶42.]     **Ida Grace One Star Marshall.** Born on June 29, 1952, she started the first grade at St. Francis Mission School in 1958 and attended until 1971. During the school year she was a boarder at the Mission until 1969, when she entered high school. In the summers while living at home, her mother made her and her sisters go to Brother Chapman to beg for food. Her mother told her that otherwise the family would starve. Brother Chapman, who served as a cook, gave out food, but he exacted a price. He would put his hands inside Marshall's panties and rub his penis on her. She witnessed Chapman doing the same things to her sister, Marian. Marian told their mother of these incidents. Marshall never told her mother, but she told her father one day at age ten when he found her crying. On that occasion, Brother Chapman had put her on a table and penetrated her and it hurt. Her father said nothing when she told him, but afterwards her mother stopped making her beg for food. In High School she learned that what Brother Chapman had done was wrong, and she told her grandmother. She coped with her memories of sexual abuse by "drinking and basically running around. . . . I didn't have to think about it." Dr. King, plaintiffs' expert witness, found that Marshall "actively avoided going into any kind of depth in processing" her abuse "and never made the connection of the abuse to her current and past symptomatology." Marshall brought suit in 2004. Taken together with the issue of fact on whether the Societies breached their fiduciary duties in not disclosing Brother Chapman's sexual misconduct with little girls, Marshall's evidence raises a genuine issue of material

fact on the questions whether she exercised due diligence to discover her causes of action and whether the Societies' breach of their fiduciary duties prevented her from discovering those causes of action.

[¶43.]     **Antoinette One Star Miller.**  A younger sister to Ida Marshall, Miller was born on December 6, 1957.  She attended St. Frances School starting with the first grade in 1960 or 1961.  She testified in her deposition about the sexual abuse she suffered at the hands of Brother Chapman when she was eleven years old.  On one occasion he rubbed his penis against her legs until he ejaculated.  Another time, he had her lick peanut butter off his nipples.  She testified that the first time she realized the problems she was having were related to her sexual abuse "would have been sometime around November 14, 2002."  For years she never talked about the abuse.  She said she did not do something about the abuse before her lawsuit "[b]ecause I didn't know how to go about it."  She had probate matters with lawyers, but she did not know how to engage a lawyer for this.  In 2010, Dr. King corroborated that Miller "cognitively avoided the memories and feelings related to the abuse until recently."  She initiated her suit in 2004.  Although there is conflicting evidence on whether Miller acted with reasonable diligence to discover her causes of action, we think the question is too close to resolve as a matter of law.  As with Ida Marshall's case, these facts are sufficient to create a genuine issue of material fact on whether the due diligence and causation elements of fraudulent concealment have been established.

[¶44.]     Both Marshall's and Miller's circumstances are distinguishable from those in *One Star*.  There, Lloyd One Star and Marian Sorace had "actual

knowledge of the basic operative facts" and "they had actual notice of substantial injury caused by that abuse" sufficient to bring suit for more than three years before they commenced it. *One Star*, 2008 S.D. 55, ¶ 35, 752 N.W.2d at 682. Nine years before bringing suit in 2004, Sorace had become "aware of both the abuse and some of the causally related injuries in 1995[,]" when she saw a mental health therapist and was encouraged to seek further professional help. *Id.* ¶¶ 21, 26. Likewise, One Star was "on inquiry notice of the relationship between his condition and its cause" when he wrote to a newspaper describing how the sexual abuse had affected him. *Id.* ¶ 19. But he failed to bring suit within the requisite three years. Here, the facts are not so clear cut. A trier of fact must determine whether the three elements for fraudulent concealment have been established sufficiently to toll the statute of limitations.

## Conclusion

[¶45.] We affirm summary judgment in the cases brought by Ralph Eagleman, Lawrence Ford, Adrian Larvie, Larry Tar, Howard Dean Graham, David Standing Soldier, Regina One Star, and Wendell D. Big Crow, Sr. We reverse and remand the cases brought by Ida Grace One Star Marshall and Antoinette One Star Miller.

[¶46.] Affirmed in part, reversed in part, and remanded.

[¶47.] GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.

[¶48.] KERN, Justice, not having been a member of the Court at the time this action was assigned to the Court, did not participate.